IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CT-3070-D

| | | |
|---|---|---|
| GREGORY EARL BAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Gregory Earl Baker ("Baker" or "plaintiff"), was a federal inmate housed at the Federal Correctional Complex in Butner, North Carolina from September 8, 2008, through March 10, 2010. During his incarceration, Baker received medical care at FCC Butner from BOP personnel and independent contractors and was transported for medical care in the private sector. Ultimately, Baker was diagnosed with a rare form of penile cancer that required a partial penectomy and lymphadenectomy.

On April 12, 2011, Baker filed suit seeking relief pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, concerning the medical care he received at FCC Butner. [D.E. 1, D.E. 3]. In his complaint, Baker alleged deliberate indifference to his medical needs in violation of the Eighth Amendment, medical malpractice, and ordinary negligence. On May 7, 2012, the court dismissed some of Baker's claims for various reasons, including an improper attempt to assert liability under respondeat superior against some defendants and a failure to plausibly allege deliberate indifference against other defendants. See [D.E. 22] 2–11.

On January 18, 2013, the court dismissed Baker's medical malpractice claim against the United States because Baker failed to comply with North Carolina Rule of Civil Procedure 9(j), which applies to medical malpractice claims in North Carolina. See [D.E. 41] 9–13. Only Baker's claim of ordinary negligence concerning employees and officers of the United States remains. See [D.E. 41, 53].

On February 11, 2013, Baker filed an amended complaint, alleging additional facts concerning his remaining negligence claim [D.E. 42]. The parties then engaged in discovery for almost one year. On March 9 and 10, 2015, the court held a bench trial on Baker's negligence claim. The court has reviewed all of the admissible evidence (including testimony, the trial exhibits, and the stipulations) and makes the following findings of fact and conclusions of law.[1] As explained below, Baker has failed to meet his burden of proof. Thus, judgment will be entered in favor of the United States.

I.

A.

This action arises under the FTCA and this court has jurisdiction over the parties and the subject matter. Baker filed a form SF-95, on June 1, 2009, seeking $5,000,000 in damages. The United States Bureau of Prisons ("BOP") received the claim on June 4, 2009, and denied it on October 15, 2009. On April 10, 2010, Baker requested reconsideration, which the BOP denied on April 17, 2011.

FCC Butner consists of five correctional institutions where male inmates reside either in individual cells or dormitories: Federal Correctional Institution I ("FCI Butner I"), Federal Correctional Institution II ("FCI Butner II"), Low Security Correctional Institution ("LSCI

---

[1] The record is voluminous. Just because the court does not reference a particular piece of evidence in this order does not mean that the court has not considered the evidence.

2

Butner"), Federal Prison Camp ("FPC Butner"), and the Federal Medical Center ("FMC Butner").

FMC Butner is a 1,062-bed hospital with diagnostic equipment, operating suites, a hospice unit, mental-health units, clinic areas, office space, surgical outpatient units, and inpatient units where inmates can be admitted for 24-hour hospital care. FMC Butner Units 5B/5C are 24-hour skilled nursing units. There are three mid-level providers and two physicians that cover the entire fifth floor, Monday through Friday (0730–1600). Unit 5B has a nurse to inmate ratio of 1 nurse to 4–5 inmates, plus nursing assistants and a 30-bed census. Unit 5C has a nurse to inmate ratio of 1 nurse to 3–4 inmates, plus nursing assistants and a 29-bed census.

The FMC Butner fourth floor has two physicians and three mid-level providers, Monday through Friday (0730–1600). Nurses are there from 0600–1900, depending on the units. FMC Butner Unit 3B houses inmates who do not require skilled nursing care and observation but have a reason to be in or near the hospital. FMC Butner has contract-physician coverage for FCC Butner 24 hours each day.

Within FCC Butner's five institutions, the BOP provides primary medical care to inmates through health services clinics located within each institution. Emergency medical technicians ("EMTs"), paramedics, nurses (both "LPNs" and "RNs"), nurse practitioners and physician's assistants ("FNPs" and "PAs"), and primary-care physicians staff these clinics.

The BOP provides higher level, specialty medical care through independent-contractor physician specialists. Def. Tr. Ex. 36 (Jimenez Decl. ¶¶ 9, 19). The independent-contractor physician specialists hold medical specialty clinics in the ambulatory care section of FMC Butner. See [D.E. 42] ¶ 15. During the time relevant to this case, FCC Butner contracted with Medical Development International ("MDI") to provide comprehensive medical care to inmates

housed at FCC Butner. See Def. Tr. Ex. 36 (Jimenez Decl. ¶¶ 4–5). In accordance with the contract, MDI (through physicians and nonmedical staff) provided myriad medical services to FCC Butner inmates, including but not limited to diagnostic imaging services, radiation-therapy services, neurological diagnostic services, medical staffing services, physician services, and inpatient and outpatient services. Id. ¶ 5.

FCC Butner does not employ a pathologist; therefore, all tissue biopsy specimens are sent to an outside civilian pathology lab. Id. ¶ 17. As a part of the institution-based physician services, MDI provided on-site physician services via on-site clinic visits and community referrals. Id. ¶ 6. The specialty physician services provided through the MDI contract included, but were not limited to Allergist/Immunologist, Cardiologist, Dermatologist, Endocrinologist, Gastroenterologist, Hematologist, Nephrologist, Neurologist, Ophthalmologist, Optometrist, Rheumatologist, and Urologist. Id. All appointments at specialty clinics, including the Urology clinic, were held at FMC Butner. Id. ¶ 19.

Dr. Adrian Ogle was the MDI independent contractor who held urology clinic at FMC Butner pursuant to the BOP-MDI contract. Id. ¶ 10; [D.E. 42-2] 5, ¶ 1. At all times relevant to this case, Dr. Ogle was a board-certified urologist, licensed in North Carolina. Def. Tr. Ex. 13a.

In 2009, urology clinics were held three times per month at FMC Butner, usually on Fridays. See Def. Tr. Ex. 9a; Def. Tr. Ex. 36 (Jimenez Decl. ¶¶ 9, 19). Dr. Ogle performed urology surgeries on inmates once per month for four hours. Def. Tr. Ex. 9a; Def. Tr. Ex. 36 (Jimenez Decl. ¶ 9); Def. Tr. Ex. 40 (Christ Decl. ¶ 13). Generally, Dr. Ogle performed urology surgery on the first Friday of the month. Def. Tr. Ex. 40 (Christ Decl. ¶¶ 9, 13). Dr. Ogle testified that he usually saw 15 patients per day on average during his urology clinic at FMC Butner.

4

Dr. Ogle's FMC Butner Clinic and Operating Room ("OR") schedule was as follows:

| Date | Time In | Time Out | Calendar |
|---|---|---|---|
| 01/30/09 | 0822 | 1218 | Clinic |
| 02/06/09 | 0822 | 1103 | OR |
| 02/13/09 | 1447 | 1610 | Clinic |
| 02/20/09 | 0818 | 1137 | Clinic |
| 02/27/09 | 0818 | 1215 | Clinic |
| 03/06/09 | 0907 | 1148 | Clinic |
| 03/13/09 | 0820 | 1145 | Clinic |
| 03/20/09 | 0810 | 1310 | Clinic/OR |
| 03/27/09 | 0850 | 1134 | Clinic |
| 04/03/09 | 0825 | 1155 | Clinic |
| 04/10/09 | Good Friday | No Show | Clinic |
| 04/17/09 | 0755 | 1425 | Clinic/OR |
| 04/24/09 | 0838 | 1510 | Clinic |
| 05/01/09 | 0837 | 1145 | Clinic |
| 05/08/09 | 0821 | 1132 | Clinic |
| 05/15/09 | 0831 | Time cut off | Clinic |
| 05/16/09 | 0821 | 1147 | Clinic |
| 05/22/09 | 0842 | 1314 | OR |
| 05/29/09 | 0854 | 1220 | Clinic |
| 06/05/09 | 0830 | 1250 | OR |
| 06/17/09 | 1212 | 1412 | Clinic |
| 06/19/09 | | | Clinic |
| 06/22/09 | 0939 | 1217 | Clinic |
| 06/26/09 | 0838 | 1109 | Clinic |
| 07/10/09 | 0851 | 1241 | Clinic |
| 07/17/09 | 0815 | 1322 | OR |
| 07/31/09 | 0920 | 1445 | Clinic |
| 08/07/09 | 0823 | 1235 | OR |
| 08/18/09 | 0903 | 1419 | Clinic |
| 09/04/09 | 0820 | 1326 | OR |
| 09/11/09 | 1144 | 1524 | OR |

5

| 09/18/09 | 0900 | 1250 | Clinic |
|----------|------|------|--------|

As for how inmates received healthcare at FCC Butner during the relevant time, each inmate was assigned to a primary-care team, consisting of a physician, a mid-level provider (physician assistant or nurse practitioner), and a nurse. Inmates without major medical conditions, or chronic conditions, but who had a medical issue or concern, could sign up each morning at each institution's health services department in order to see a medical provider. Inmates appeared at "sick call" and informed the attending staff of their symptoms and concerns. Medical staff triaged the complaint and determined who needed to be seen immediately and who could be scheduled for an appointment in the coming days.

Call-outs are a scheduling system at FCC Butner for appointments (including medical, dental, education, team meetings and other activities) and were posted each day on the unit bulletin board after 4:00 pm, on the day preceding the appointment. Each inmate had to check for appointments on a daily basis. Inmates were expected to keep all scheduled appointments. Failure to report to a call-out could result in disciplinary action. The call-out listed the inmate's name and number, and the appointment's time and location.

Once a member of the inmate's primary-care team evaluated an inmate at the scheduled appointment, a primary-care team provider could request a referral for the inmate to see one of the MDI contract specialists in one of the specialty clinics. During the relevant period, MDI contract physicians staffed the specialty clinics. Def. Tr. Ex. 36 (Jimenez Decl. ¶ 12). The onsite MDI Scheduler, who was not a BOP employee, was responsible for scheduling all appointments for specialty clinics, including the Urology clinic. Id. In 2009, MDI, not the BOP, scheduled appointments with outside community medical providers. Id. ¶ 14.

6

In 2009, scheduling of appointments with the on-site contract specialist providers, or the on-site OR, was initiated by a "Consult" request being submitted to MDI by the treating provider after the provider saw the inmate. Def. Tr. Ex. 40 (Christ Decl. ¶ 4). Both BOP treating providers, including members of the inmate's primary-care team, or MDI contract physicians could submit consult requests. Id. The BOP did not require utilization-review approval for clinic visits and procedures performed within FMC Butner, but did require such approval for nonemergency medical appointments with community providers and for nonemergency procedures performed outside of FMC Butner. For surgery appointments, MDI staff notified the BOP of the available dates for their contract physicians to perform surgeries, including Urology surgeries. Id. ¶ 9. The MDI contract physicians "selected the cases" that each specialist wanted on the physician's surgery schedule for the FMC operating room. See Def. Tr. Ex. 1 (Bates 51).

At all relevant times, the process for referring an inmate who was housed within FMC Butner for an appointment with an outside community medical provider for nonemergency care was the same as it would be for any inmate at FCC Butner. The physician or mid-level provider submitted the consult request, indicating the type of consult required, and the time frame needed (e.g., emergent, within 2 weeks, within 1 month). After the Utilization Review Committee approved the consult, the MDI scheduler contacted the community provider and scheduled the appointment.

Any physician or mid-level provider, including contract physicians (also referred to as hospitalists), could transfer an inmate to a community hospital's emergency department. If the physician or mid-level provider made the transfer decision after normal business hours, then the physician or mid-level provider notified the Clinical Director or on-call physician, letting him or her know of the inmate transfer. As part of this transfer notification, the physician or mid-level

provider would discuss the case with the Clinical Director, or on-call physician, and the Clinical Director could decide that the inmate did not require emergency transport at that time. However, the final decision on whether to transport an inmate to the emergency department was left to the physician or mid-level provider who was at the institution and treating the inmate. The BOP did not require prior approval for an emergency medical transport. This process concerning emergency medical transport applied whether the inmate was housed at FMC Butner or in one of the other four institutions at FCC Butner.

In 2009, transportation to and from community medical providers was coordinated through FCC Butner's town-trip coordinator. Def. Tr. Ex. 36 (Jimenez Decl. ¶ 15). FCC Butner's town-trip coordinator was a BOP employee whose primary duty was to coordinate the paperwork associated with the outside medical trips. Id. In 2009, this paperwork was routed through the inmate's primary provider, nursing, the Complex Health Services Administrator, the Clinical Director, the inmate's unit team, and institution executive staff, so that all relevant parties were aware of an inmate's scheduled outside medical trip. Id. The town-trip coordinator did not schedule or reschedule inmates for on-site or outside medical appointments. Id. The BOP town-trip coordinator simply coordinated the paperwork for transportation. See id. At all relevant times, the medical records at FCC Butner, primarily, were paper records. Def. Tr. Ex. 40 (Christ Decl. ¶ 5). In 2009, FCC Butner was transitioning to electronic records. Id.

At all relevant times, the five institutions that comprise FCC Butner were each a separate facility with their own secure perimeter. Complex Transportation Officers ("CTOs") transported inmates outside the secure perimeter of each of the FCC Butner Institutions, both intracomplex (between the various institutions at FCC Butner) and outside of FCC Butner. Def. Tr. Ex. 35 (Moscar Decl. ¶ 2). In order to attend Dr. Ogle's urology clinic at FMC Butner or to attend a

8

medical appointment in the community, CTOs transported Baker from FCI Butner II, where he was housed, to the clinic area in FMC Butner or to the community medical provider's office or the community hospital. Def. Tr. Ex. 36 (Jimenez Decl. ¶ 19).

At all relevant times, the CTOs moved inmates in bulk (i.e., all inmates housed at FCI Butner II who had appointments on a given day at FMC Butner went at the same time). The CTOs would not transport an inmate from an FCC institution, such as FCI II, to FMC Butner for a clinic appointment unless the inmate's paper record (medical chart) was transported along with the inmate. Def. Tr. Ex. 35 (Moscar Decl. ¶ 4). CTOs also transported inmates to medical appointments in the community.

When an institution was on lockdown status, inmate movement between institutions was limited. Nonetheless, during a lockdown, CTOs transported inmates to scheduled medical appointments outside of FCC Butner. Id. ¶ 3. During a lockdown, CTOs also transported inmates within FCC Butner for emergency treatment or when a BOP medical provider indicated the appointment or required treatment could not wait. Id.

Inmates who refused to be transported for a medical appointment were escorted to Health Services to sign a Medical Refusal Form. When an inmate failed to appear for a medical appointment, the inmate was marked as a "no show," the operations lieutenant was notified, and a list of "no shows" was generated and distributed to the Assistant Health Service Administrators. Correctional officers, including CTOs, do not have the authority to reschedule medical appointments or to enter into the BOP computer system consultation requests for an inmate to be seen by a contract medical specialist. Id. ¶ 4.

When an inmate was scheduled for an appointment at FMC Butner with an MDI contract specialist and the inmate missed the scheduled appointment, the inmate's primary-care physician

would discuss with the inmate whether the inmate wished to reschedule the appointment. Def. Tr. Ex. 37 (Duchesne Decl. ¶ 21). If the inmate wished to reschedule the appointment, then the BOP primary-care provider would resubmit a consultation request to MDI in order for MDI to reschedule the appointment. Id. MDI did not automatically reschedule the inmate for an appointment. Id.

CTOs transported Baker for medical care on the following dates and times:

| Date | Location | Time In | Time Out |
|------|----------|---------|----------|
| 12/19/08 | FMC Butner | 0751 | 1404 |
| 01/13/09 | Local Hospital | 0651 | 1455 |
| 02/13/09 | FMC Butner | 0855 | 1743 |
| 04/10/09 | FMC Butner | 0819 | 1347 |
| 04/24/09 | FMC Butner | 0851 | 1711 |
| 05/01/09 | FMC Butner | 0833 | 1442 |
| 05/15/09 | FMC Butner | 0813 | 1810 |
| 06/08/09 | FMC Butner | 1014 | 1409 |
| 06/10/09 | FMC Butner | 0804 | 1443 |
| 07/16/09 through 07/17/09 | FMC Butner | 0833 (07/16/09) | 1704 (07/17/09) |
| 07/29/09 | FMC Butner | 0804 | 1409 |
| 07/31/09 | FMC Butner | 0947 | 1507 |
| 08/03/09 | FMC Butner | 0750 | 1358 |
| 08/28/09 | FMC Butner | 0814 | 1414 |
| 09/08/09 | FMC Butner | 0816 | 1340 |
| 09/14/09 | Local Hospital | 1320 | 1743 |
| 09/23/09 through 09/26/09 | Local Hospital | 1503 (09/23/09) | 1957 (09/26/09) |
| 10/16/09 | Local Hospital | 1217 | 1438 |
| 11/06/09 | Local Hospital | 0815 | 1133 |
| 11/19/09 through 11/25/09 | Local Hospital | 0551 (11/19/09) | 2205 (11/25/09) |
| 11/27/09 | Local Hospital | 1248 | 1525 |
| 11/29/09 | Local Hospital | 1454 | 2320 |

10

| 12/16/09 through 01/15/10 | Local Hospital | 1251 (12/16/09) | 1411 (01/15/10) |
|---|---|---|---|
| 02/19/10 | Local Hospital | 1053 | 1306 |

As for work assignments during the relevant time, inmates received a job assignment once medically cleared. Generally, the initial job assignment for all inmates was food service. An inmate had to submit requests for job changes through the inmate's supervisor.

Each institution tried to provide a job for inmates physically able to work and not otherwise engaged in certain educational, mental health, or substance abuse programs. Inmates assigned to a prison job were paid various rates based upon their performance, their seniority, their disciplinary record, their educational level, and the type of job. Inmates were paid on a monthly basis at a nominal hourly rate, based upon the number of hours worked during the previous month. Inmates were prohibited from running any businesses, whether in the community or inside the institution, and inmates were prohibited from performing work for other inmates. Inmates also were not permitted access to cash or direct access to the funds in their account.

While incarcerated at FCI Butner II, Baker was assigned to the Facilities Department/Plumbing Shop from September 17, 2008, through December 6, 2008, and then as a Recreation Orderly, in the afternoons, from December 6, 2008, through July 20, 2009. Baker was on "medical convalescence" from July 20, 2009, through August 21, 2009, and then worked again as a Recreation Orderly, in the afternoons, from August 21, 2009, through September 26, 2009. From September 26, 2009, Baker was housed at FMC Butner and was designated "no work assignment." Baker was paid at Performance Pay Level 4 ($0.12/hour) for a portion of his time, and at Performance Pay Level 3 ($0.17/hour) for other portions of his time. From January 2009 through April 2009, Baker was paid the following amounts for work performed during the

11

prior month:

> 1/09/09 – Payroll-IPP - $1.92 – 16 hrs., 11/25/08-12/24/08
> 2/09/09 – Payroll-IPP - $12.00 – 100 hrs.,12/25/08-1/24/09
> 3/09/09 – Payroll-IPP - $27.20 – 160 hrs.,1/25/09-2/24/09
> 4/10/09 – Payroll-IPP - $29.00
> 5/08/09 – Payroll-IPP - $20.30
> 6/08/09 – Payroll-IPP - $17.40
> 7/10/09 – Payroll-IPP – $27.26
> 8/10/09 – Payroll-IPP - $20.01
> 9/09/09 – Payroll-IPP - $20.01

Def. Tr. Ex. 24.

Each inmate at a BOP-managed facility is provided a trust account, to which the inmate may receive funds from individuals outside the institution, and to which the inmate's earnings are deposited. With these funds, inmates may purchase items from the institution's commissary and also transfer funds to the inmate's TRUFONE account (telephone system).

The abbreviations in the trust account statement are as follows:

> Phone Withdrawal – indicates a withdrawal of funds from Baker's trust account, and transfer to his TRUFONE account
>
> Sales – indicates a purchase at the institution's commissary
>
> Payroll – IPP – indicates monthly inmate performance pay for work performed at the prison job during the prior month
>
> Lockbox – CD – indicates a check sent to the BOP's Lockbox for deposit into Baker's trust account – these are funds mailed to the lockbox for Baker specifically, from someone in the community.
>
> SPO – indicates a "Special Purchase Order" – this could be a money order that Baker sent to someone in the community, an order for books from a publisher, an order of hobby/craft/art supplies, or some other approved order – this, generally, is an approved purchase for items not in the commissary
>
> SPO – Released – indicates the release of the funds held pending the approval of the "SPO."

Each BOP facility provides a commissary where inmates may purchase various items,

including clothing and personal items, shoes, watches and radios, food and beverages, postage stamps, cards and envelopes, and bowls, etc. See Def. Tr. Ex. 16 (listing items for sale at FCC Butner Commissary in 2011). Each week, inmates with available funds in their commissary accounts may submit an order form, indicating the items they would like to purchase. On a later date, inmates are permitted to go to the commissary to obtain their order, at which time their inmate identification card is swiped, and the inmate's trust account is debited for the order. Unless the inmate is in the Special Housing Unit, otherwise confined to his cell for security reasons, or confined to a hospital bed, all inmates must physically retrieve their commissary orders. Inmates are prohibited from possessing another inmate's identification card and from using their purchased commissary items as barter or payment to other inmates for services.

BOP provides three meals for each inmate, all of which include heart healthy options. Inmates also have the ability to purchase food at the commissary, and inmates are not required to attend and partake in the BOP-provided meals. Individual housing units in the institution's general population each have their own kitchen area, including an ice machine and microwave ovens. Inmates may cook their own meals and food in the housing units, but they must clean up after themselves. Inmates are limited in the amount of personal property, including food, that they may maintain in their possession and cell.

Baker's commissary account reflects that Baker placed and received orders for food and other items, from January through September 2009, as follows:

January 2009:
    01/05/09 - $122.88
    01/12/09 - $114.09
    01/21/09 - $67.58

February 2009:
    02/02/09 - $59.55
    02/09/09 - $121.65

13

02/17/09 - $121.65
02/23/09 - $90.40

March 2009:
03/02/09 - $29.35
03/09/09 - $125.98
03/16/09 - $182.06

April 2009:
04/02/09 - $70.45
04/09/09 - $142.91
04/16/09 - $70.89
04/23/09 - $87.79
04/30/09 - $38.50

May 2009:
05/07/09 - $119.58
05/07/09 - $25.20
05/14/09 - $70.10
05/14/09 - $7.75
05/14/09 - returned item for credit
05/21/09 - $89.50
05/21/09 - $0.60
05/28/09 - $49.00

June 2009:
06/04/09 - $127.44
06/04/09 - $20.80
06/11/09 - $130.51
06/18/09 - $77.20

July 2009:
07/01/09 - $39.10
07/08/09 - $163.87
07/15/09 - $116.28
07/15/09 - $7.45
07/22/09 - $38.78
07/29/09 - $39.10
07/29/09 - $2.10

August 2009:
08/05/09 - $77.69
08/12/09 - $136.05
08/12/09 - $2.30
08/12/09 - returned item for credit
08/12/09 - $18.10

14

08/19/09 - $59.85
08/26/09 - $53.35

September 2009:
09/02/09 - $26.90
09/09/09 - $139.20
09/09/09 - returned item for credit
09/16/09 - $9104.20
09/22/09 - $97.39
09/22/09 - $10.00

Def. Tr. Ex. 24.

Generally, all inmates are provided with telephone privileges, provided they have not been sanctioned with the loss of telephone privileges or are under restricted communications. Each inmate with telephone privileges is provided an individual access code, which he must input into the inmate telephone before placing a call. Inmates must use the designated bank of telephones in their housing unit when placing calls. Baker's call history indicates that he regularly called only two telephone numbers, based in Hamilton and Cincinnati, Ohio. The phone number in Hamilton was for Baker's mother.

The Recreation Department regularly sponsored sports leagues and special events for inmates. The sports leagues generally included football, basketball, and softball, and inmates could voluntarily participate in the leagues. Additionally, the Recreation Department regularly sponsored special events, such as the "Winter Olympic Games", which could involve a single day or multiple days of various games and events. Once an inmate participated in a Recreation Department sponsored event, the Recreation Department generally issued a certificate to the inmate, which is maintained in the inmate's central file. The dates on the certificates generally indicate the date(s) of the event.

Baker received the following Certificates for Achievement for participating in activities through the Recreation Department:

15

October 2008: Individual Fitness Challenge. Def. Tr. Ex. 15 (Bates 5139).

November 2008: A&O Wealth of Health Class. Id. 5136.

December 2008: Drug Education; Introduction to Hobby Craft Class. Id. 5132, 5135.

February 2009: Healthy Lifestyles. Id. 5125.

March 2009: Winter volleyball; LC Unit Representative; Advanced Circuit Training Class; Winter Olympic Games (Participated in Talent Show, Hole In One using crochet, Badminton, checkers toss, Bingo). Id. 5120, 5124, 5126–31.

April 2009: Beginning Step Aerobics Class. Id. 5121.

To raise an issue with staff during the relevant time, inmates used a form entitled an "Inmate Request to Staff." See Def. Tr. Ex. 41 (BOP Program Statement 5511.07, Request to Staff, Inmate (08/14/98)). Through this form, an inmate could present a written request to institution staff, in any department, or to his unit team or the warden, in order to address any questions, requests, or concerns the inmate had. The inmate usually submitted the "Inmate Request to Staff" through the institution mail system. Staff in receipt of the "Inmate Request to Staff" (also sometimes referred to as a "cop-out") generally provided a written response to the inmate. The BOP generally maintained a copy of the "Inmate Request to Staff" form in the inmate's central file. Additionally, the BOP generally maintained a copy of the "Inmate Request to Staff" forms that were submitted to the institution's medical department or medical staff in the inmate's electronic medical record (or BEMR). The "Inmate Request to Staff" form is separate from the Administrative Remedy Program.

Under the Administrative Remedy Program, inmates could present written complaints or grievances to the BOP. See 28 C.F.R. § 542.10 et. seq.; Def. Tr. Ex. 42 (BOP Program Statement 1330.18, Administrative Remedy Program (01/06/14); FCC Butner Complex Supplement BUX 1330.13B, Administrative Remedy Procedures for Inmates (11/01/10)). Under

16

the Administrative Remedy Program, inmates could attempt to resolve their complaints informally, by discussing the matter with a member of the unit team. 28 C.F.R. § 542.13. The BOP documents this attempt at resolution on a "BP-8" form. If the attempt at informal resolution did not resolve the matter, the inmate could file a formal complaint with the warden via a BP-9 form within twenty days of the date on which the basis of the complaint occurred. 28 C.F.R. §§ 542.13-14. Before filing an administrative remedy with the warden (the BP-9 form), the inmate had to attempt to informally resolve the issue. If the inmate was not satisfied with the warden's response to his formal complaint, he could appeal the response to the regional director via a BP-10 form. 28 C.F.R. § 542.15(a). If the inmate was dissatisfied with the regional response, he could file an appeal via a BP-11 form with the national appeals administrator at the BOP's Central Office in Washington, D.C. 28 C.F.R. §§ 542.13-15. The Central Office appeal is the final level of administrative review in the BOP's administrative-remedy process. 28 C.F.R. §§ 542.13-15.

B.

Baker was born in March 1964. Baker worked in the concrete industry until approximately 2004, when he was imprisoned in Ohio for felony DUI. Thereafter, Baker was convicted of a federal gun charge and sentenced to federal prison. Baker arrived at FCC Butner on September 8, 2008, and was released on March 10, 2010. Def. Tr. Ex. 23 (Cox Decl. ¶¶ 3, 5). Baker was housed at the FCI Butner II from September 8, 2008, until September 26, 2009. Baker was housed at FMC Butner from September 26, 2009, through his release on March 10, 2010. Id. ¶ 5.

On September 8, 2008, EMT Connor conducted Baker's intake examination. Def. Tr. Ex. 1 (Bates 757–60). On September 16, 2008, PA Burt conducted Baker's Food Service

17

Physical Exam. Id. 745–56, 1059. Dr. Mercado cosigned PA Burt's examination note, and the note states "Cosigner comments: Inmate has been evaluated with PA and agree with plan of care." Id. 756.

Baker stated that his pre-incarceration medical history included asthma (juvenile onset age 9–18), gastro-esophageal reflux disease (GERD), HCV (Hepatitis C virus diagnosed 2003), lower urinary tract symptoms (LUTS), chicken pox, and a fractured left foot. Id. 745–60, 1054. Baker stated that he had no current mental health issues or history of mental health treatment. Id. 757–60. Baker also stated that his current tobacco usage was two packs per day for 15 years. Id. 749. (Baker later told Dr. Inman at Duke that he "smoked one pack per day from age 20; two packs per day to age 40. Does not smoke cigars or pipes or chew tobacco." Def. Tr. Ex. 5a (Bates 1433).) Baker stated that he had a history of smoking marijuana daily, but he had last used marijuana more than five years earlier. Def. Tr. Ex. 1 (Bates 747). Baker stated that he was hospitalized in 1990 for abdominal trauma/hernia surgery in 1990. Id. 750. Baker also stated that he was using the following medications: Prilosec and antifungal cream for his feet. Id. 1054.

During the Food Service exam on September 16, 2008, PA Burt documented that Baker had an "enlarged prostate" and "redness to urethral meatus" (i.e., redness around the circular end of the urethra tube where it opens at the tip of penis and urine exits). Id. 754. PA Burt ordered medication (Ciprofloxin and Doxazosin) for chronic prostatitis and pain medication (Ibuprofen 800 mg bid) for chronic prostatitis. Id. 756. PA Burt also ordered an inhaler (Albuterol) for Baker's asthma. Id.

On September 16, 2008, PA Burt saw Baker in the Chronic Care Clinic for his chronic medical issues: GERD (i.e., gastro-esophageal reflux disease proton pump inhibitor); chronic

HCV (Hepatitis C); LUTS (i.e., lower urinary tract symptoms); and chronic prostatitis. Id. 743–44. PA Burt noted that Baker was not a candidate for treatment of HCV because of PRD (i.e., polycystic renal disease) and treatment was "not clinically indicated at this time." Id. 743. PA Burt also noted that Baker was taking medication for GERD, prostatitis, and asthma. Id. 743–44. PA Burt ordered follow-up at the Chronic Care Clinic in six months. Id. 744.

On November 2, 2008, Baker asked to see a urologist because the medication was not giving him relief and he had the same urologic symptoms. On November 7, 2008, Baker was directed to go to sick call for triage.

On November 14, 2008, PA Burt saw Baker in sick call/triage and no physician cosign was required. Id. 735–37. PA Burt documented that Baker was a 44-year-old male with a four-year history of urinary hesitancy, weak stream, and feeling of incomplete bladder emptying. Id. 735. PA Burt noted that Baker had been treated with two medications (Ciprofloxin and Doxazosin) for prostatitis and one (Ibuprofen) for pain to which Baker reported "some improvement with the Doxazosin but not a lot." Id. Baker stated that he had painful urination (dysuria), blood in his urine (hematuria), and hesitancy in urine flow. Id. 735. PA Burt documented that Baker's "distal urethra is very inflamed and almost granulomatous appearing" (i.e., end of urethra that is farthest from the body is very inflamed and granulomatous). Id. 736. PA Burt assessed: "chronic prostatitis, worsened and nonspecific urethritis – initial and temporary/acute." Id. PA Burt noted that Baker was "unable to pass a catheter, even the smallest one here (14 French)" through Baker's urethra into his bladder to obtain a postvoid residual urine sample in order to see how much urine was retained after Baker urinated on his own. Id.

On November 14, 2008, PA Burt asked MDI for a urology consultation "within month"

19

to "assess need for further [work-up]." Def. Tr. Ex. 3 (Bates 7). PA Burt noted Baker's four-year history of lower urinary tract symptoms, treatment with medication, that Baker reported "very little benefit," and that a 14 French catheter could not be passed "due to urethral obstruction." Id.

On December 19, 2008, Dr. Ogle saw Baker in the urology clinic at FMC Butner. Id.; Def. Tr. Ex. 18 (Bates 158, ¶ 1). Dr. Ogle documented "circumcised phallus with ulceration right meatus [the end of the urethra where it opens at the tip of penis and where urine exits the body]." Def. Tr. Ex. 3 (Bates 7). Dr. Ogle did not believe that Baker's penis appeared to have cancer. Dr. Ogle diagnosed "urethral stricture" and ordered "cysto/DVIU **ASAP** [with] urethral biopsy; [and] IgG for HSV I & II [Herpes Simplex Virus]." Id. (emphasis added). Dr. Ogle's order was for a cystoscopy/direct vision internal urethrotomy of Baker's urethra to be performed at the FMC Butner as soon as possible and for blood tests for Herpes Simplex Virus.

Direct vision internal urethrotomy ("DVIU") is a surgery to repair a narrowed section of the urethra. This narrowed section is referred to as a stricture. The urethra is the tube through which urine passes from the bladder to the outside of the body. Urethral stricture is due to scarring of the urethra. Dr. Ogle believed that Baker's stricture (or narrowing) possibly was caused by an STD or some kind of scar tissue. After DVIU surgery, a patient normally feels some pain in the area of repair for about two weeks and generally receives pain medicine to take as needed.

On December 22, 2008, PA Burt asked MDI to schedule the cysto/DVIU/urethral biopsy ASAP per Dr. Ogle's recommendation. Def. Tr. Ex. 1 (Bates 1046). PA Burt requested the appointment be made "Within Same Week." Id.

On December 30, 2008, Baker's blood test for herpes reported as positive. Def. Tr. Ex. 7

20

(Bates 9). By January 5, 2009, BOP's computerized record system was updated with Baker's positive result of the blood test for Herpes Simplex Virus. Id.

On January 7, 2009, the preoperative chest x-ray noted "mild prominence of the pulmonary insterstitium of undetermined age but this finding is frequently associated with tobacco use." Def. Tr. Ex. 8 (Bates 1032).

On January 13, 2009, Dr. Ogle examined Baker before performing surgery at Maria Parham Medical Center, a civilian hospital. Def. Tr. Ex. 3 (Bates 14–15); Def. Tr. Ex. 18 (Bates 158, ¶ 2). Dr. Ogle did not believe that Baker's penis appeared to have cancer. Dr. Ogle documented that Baker "has a circumcised phallus with ulceration at the right meatus and fibrotic urethra, palpable distally. A 14-French catheter is unable to be passed." Def. Tr. Ex. 3 (Bates 14). Dr. Ogle noted Baker's history of urologic symptoms and "history of multiple drug use." Id.

In his operative note of January 13, 2009, Dr. Ogle noted that, during surgery, he could not pass the scope through the meatus [circular opening at tip of penis where urine exits the body] until after the meatus was dilated. Id. 12. Dr. Ogle noted that the "entire length of the penile urethra appeared to be fibrotic this was biopsied." Id. Dr. Ogle placed an indwelling [Foley] catheter in Baker's bladder. Id.[2]

After the surgery, Dr. Ogle wrote the following orders: "keep the indwelling catheter for 5 days and keep [Baker] on antibiotics once a day while the catheter is in." Id. 12–13. Dr. Ogle did not order a follow-up visit. Id. 11–13.

On January 13, 2009, civilian pathologist Dr. Veena Doshi, prepared the pathology report

---

[2] During Baker's trial testimony, he often testified inconsistently with the dates and events in his medical records. The court does not credit Baker's testimony that conflicts with the medical records. Baker also testified that he perceived numerous Butner personnel to be indifferent to his health concerns. The court does not credit Baker's testimony.

of the urethral biopsy. The report documented dysplastic squamous cell epithelium. See Def. Tr. Ex. 6 (Bates 4866). Dr. Doshi sent the pathology report to Dr. Ogle's office via facsimile transmission on January 13, 2009. Id. 103. At trial, Dr. Paul Hatcher (an oncologist) explained that dysplastic squamous cell epithelium means that the cells did not look normal and should be watched.

On January 14, 2009, Dr. Doshi discussed the pathology findings with Dr. Ogle. Id. 4866. Dr. Doshi is board certified in Anatomic and Clinical Pathology as well as Cytopathology. Def. Tr. Ex. 13b (Bates 5906). Dr. Ogle testified that he believed that the pathology report meant that Baker was negative for cancer. Dr. Ogle also testified that he is familiar with penile cancer and that the type of cancer that Baker ultimately was diagnosed with was very rare. Based on his contemporaneous observations of Baker's penis in January 2009, Dr. Ogle did not believe that Baker's penis appeared to have cancer.

On January 14, 2009, at 0720, PA Burt saw Baker for a "Post – Procedure Follow-up counter performed at Health Services" Unit in FCI II. Def. Tr. Ex. 1 (Bates 729–31). Dr. Mercado cosigned PA Burt's note on January 14, 2009. Id. 731. PA Burt noted that Baker presented to Health Services "first thing this AM with genitourinary pain." Id. 729. PA Burt noted that there was no postoperative paperwork available and that Baker stated that the correctional officer had returned to the civilian hospital to retrieve the paperwork. Id. PA Burt documented that "[y]esterday [Baker] had a direct visualization of the urethra and probably lysis of urethral stricture and remains catheterized with leg bag." Id. Although Baker reported receiving no antibiotics or analgesia, Baker reported that he received acetaminophen (analgesia) the previous night. Id. PA Burt ordered Bactrim (twice per day for 7 days), Oxycodone (1 pill four times per day for 3 days), and Ibuprofen 800 mg (3 times per day for 30 days), removal of

22

catheter one week after the surgery, and entered an excused absence from work ("idle for work"). Id. 18–20, 730. PA Burt also entered a request to MDI for a "post-op visit" with Dr. Ogle on "1/23/09." Id. 20, 730. PA Burt entered the request to MDI on January 14, 2009. See id. 20.

On January 14, 2009, at 0850, PA Burt noted that Baker's postoperative "paperwork was found" and that Dr. Ogle ordered the removal of Baker's indwelling urethral catheter "on Sunday (5 days post-op) and Bactrim just daily for 5 days." Id. 18. PA Burt indicated that he would "have weekend staff [remove Baker's] catheter and [Burt would] change the [prescription] for Bactrim." Id. PA Burt ordered "follow-up with Dr. Ogle as scheduled; Catheter out in 5 days (Sunday); Bactrim for 5 days (daily)."

FCC Pharmacy filled the prescription for Bactrim DS. It was a self-carry medication given to Baker to take as directed. See Def. Tr. Ex. 34 (Bryan Decl. ¶ 4).

On January 18, 2009, the medical staff at Butner removed Baker's indwelling catheter. Def. Tr. Ex. 18 (Bates 158, ¶¶ 4, 6); [D.E. 42] ¶ 23.

On January 30, 2009, Dr. Ogle held urology clinic at FMC Butner. Def. Tr. Ex. 9a; Def. Tr. Ex. 9b (Bates 2191, 2330). MDI did not schedule Baker for an appointment with Dr. Ogle on that date.

February 6, 2009, was an OR day at FMC Butner for Dr. Ogle. Def. Tr. Ex. 9a; Def. Tr. Ex. 9c (Bates 317). Only the nephrology clinic was held at FMC Butner on February 6, 2009. Def. Tr. Ex. 9b (Bates 2193).

On February 13, 2009, Dr. Ogle examined Baker in Urology Clinic. Def. Tr. Ex. 3 (Bates 20). Baker complained of urethral discharge and decreased flow of stream of urine. Id. On examination, Dr. Ogle noted ulceration on the right meatus. Id. Dr. Ogle did not believe that

Baker's penis appeared to have cancer. Dr. Ogle ordered the urethral discharge to be cultured and a second blood test for herpes. Id. Dr. Ogle ordered Pyridium to soothe Baker's urinary tract. Id. Dr. Ogle passed a 14 French catheter to see if Baker's urethra was patent, and then, if patent, Dr. Ogle ordered Baker to pass a catheter into his urethra [self-dilate] once per week. Id. Dr. Ogle ordered a follow-up visit in two weeks. Id.

Baker contends that at this February 13, 2009 visit, Dr. Ogle "faxed his office for a set of his post-operative orders to verify" the orders that he had given to the BOP on January 13, 2009. See Def. Tr. Ex. 18 (Bates 158–59, ¶ 10). Despite Baker's correspondence with Dr. Ogle in May 2012 requesting all of Dr. Ogle's records, Baker never produced during discovery or at trial any documentation that Dr. Ogle ordered anything other than an indwelling catheter and Bactrim for 5 days, as noted above. See Def. Tr. Ex. 3 (Bates 11–13). Thus, the court does not credit Baker's contention.

On February 13, 2009, Dr. Mercado noted that the culture was sent to the lab, the blood test was scheduled to be drawn on February 17, 2009, and Baker was scheduled to be taught how to pass the catheter on February 18, 2009. Def. Tr. Ex. 1 (Bates 21).

On February 15, 2009, the urine culture report issued and recommended a retest. Def. Tr. Ex. 7 (Bates 1024). On February 17, 2009, a second urine culture reported no growth. Id. 1023.

On February 17, 2009, Dr. Mercado noted that Dr. Ogle ordered Baker to "self cath every week if patent." Def. Tr. Ex. 1 (Bates 22). Dr. Mercado ordered Pyridium and submitted a request to MDI to schedule a follow-up visit with Dr. Ogle for two weeks. Id. The BOP promptly filled the prescription for Pyridium. Def. Tr. Ex. 34 (Bryan Decl. ¶ 5).

On February 20, 2009, Baker's second blood test was positive for Herpes. Def. Tr. Ex. 7 (Bates 23). On February 20, 2009, Dr. Ogle held urology clinic at FMC Butner. Def. Tr. Ex. 9a;

24

Def. Tr. Ex. 9b (Bates 2197, 2384).

On February 25, 2009, PA Burt reordered Pyridium. Def. Tr. Ex. 1 (Bates 1021). On February 27, 2009, Dr. Ogle held urology clinic at FMC Butner. Def. Tr. Ex. 9a; Def. Tr. Ex. 9b (Bates 2199, 2402).

On March 6, 2009, Dr. Ogle held urology clinic at FMC Butner. Def. Tr. Ex. 9a; Def. Tr. Ex. 9b (Bates 2201, 2418). Baker is listed on the urology clinic's handwritten schedule, but the BOP did not transport Baker to the FMC. See Def. Tr. Ex. 10; Def. Tr. Ex. 9b (Bates 2201). Warden Stephens informed Baker that he was not transported to FMC Butner "[d]ue to a misunderstanding regarding your health record." Def. Tr. Ex. 17 (Bates 5171); Def. Tr. Ex. 18 (Bates 159, ¶ 14).

On March 13, 2009, Dr. Ogle held urology clinic at FMC Butner. Def. Tr. Ex. 9a; Def. Tr. Ex. 9b (Bates 2203, 2438).

On March 16, 2009, PA Burt saw Baker in the Chronic Care – Infectious Disease clinic. Def. Tr. Ex. 1 (Bates 25–27). Dr. Claudius cosigned PA Burt's note. Id. 27. PA Burt documented that Baker presented to clinic complaining of respiratory congestion. Id. 25. PA Burt noted that

> Baker reports that he continues to have a sore on his glans that has been there since surgery. [Baker] was seen once in [follow-up] with urologist with instructions to self-dilate. [Baker] has been [self-dilating his urethra three times per week] and reports that it is 'too painful' to do it every day. [Baker] was supposed to see [the urologist] last Friday [March 13, 2009] in [follow-up] however custody cancelled this appointment for unknown reason. [Baker] reports that his asthma is controlled.

Id. Baker told PA Burt that urination was painful (dysuria) and that his "urine comes out fine" "on the days that I cath myself." Id. PA Burt noted that the blood test for herpes was positive and the urine culture was negative. Id. 26. On physical exam, PA Burt noted that "at the os

25

[meatus – circular opening for urine to exit penis] of [Baker's] glans there is a lesion..an ulcerative type of lesion that is friable." Id. PA Burt documented that the January 2009 biopsy of the urethral stricture showed "dysplastic cells." Id. 27. PA Burt renewed Baker's medications, ordered follow-up in Chronic Care Clinic in six months, and submitted a request to MDI to schedule a follow-up visit in urology clinic "for stricture and penile lesion with questionable premalignant lesion." Id.

March 20, 2009, was an OR day at FMC Butner for Dr. Ogle, but he also saw two patients in urology clinic. See Def. Tr. Ex. 9a; Def. Tr. Ex. 9b (Bates 2205, 2458); Def. Tr. Ex. 9c (Bates 318). MDI did not put Baker's name on the list for urology clinic. See Def. Tr. Ex. 9b (Bates 2205).

On March 27, 2009, Dr. Ogle held urology clinic at FMC Butner. Def. Tr. Ex. 9a; Def. Tr. Ex. 9b (Bates 2207, 2476). MDI did not put Baker's name on the list for urology clinic. Def. Tr. Ex. 9b (Bates 2207).

On April 1, 2009, PA Burt documented that Baker approached an Assistant Health Services Administrator about not seeing Dr. Ogle since his initial postoperative follow-up visit. Def. Tr. Ex. 1 (Bates 28). Baker stated that "[h]e was all set to go however his trip was cancelled by custody (per inmate)." Id. PA Burt submitted a request to MDI to schedule a follow-up visit with Dr. Ogle – "Next Available Clinic." Id. 28, 1006. PA Burt entered the request on April 1, 2009, and MDI scheduled Baker for urology clinic on April 17, 2009. See id. 1006.

On April 3, 2009, Dr. Ogle held urology clinic at FMC Butner. Def. Tr. Ex. 9a; Def. Tr. Ex. 9b (Bates 2209, 2491). MDI did not put Baker's name on the list for urology clinic.

On April 10, 2009, BOP transported Baker to FMC Butner. Def. Tr. Ex. 10. On April 10, 2009, however, Dr. Ogle did not attend urology clinic because he mistakenly thought Good

Friday was a federal holiday. Def. Tr. Ex. 1 (Bates 29, 36); Def. Tr. Ex. 17 (Bates 5171); Def. Tr. Ex. 18 (Bates 160, ¶ 16).

On April 13, 2009, at 0954, PA Brooks saw Baker in sick call/triage. Def. Tr. Ex. 1 (Bates 29–30). No cosign was required. Id. 30. PA Brooks documented that Baker "presents with skin lesion on penile os. His labs were positive [for Herpes] that he reports as 'nerve' type pain symptoms." Id. 29. Baker complained of pain when he urinated and when the lesion was touched. Id. PA Brooks examined Baker and described Baker's penile lesion as "skin lesion – [u]lcerated lesion on penis os with erythematous base[]" and ordered Acyclovir for ten days. Id. 29–30. The BOP promptly filled the prescription for Acyclovir.

On April 13, 2009, PA Burt submitted a request to MDI to schedule Baker for a follow-up visit in urology clinic "ASAP" and "[w]ithin Same Week." Id. 36. PA Burt noted that Baker was to be seen on April 10, 2009, but that Baker's trip was cancelled due to Dr. Ogle's misunderstanding about Good Friday. See id. PA Burt noted also that the January 2009 biopsy results were back and that Baker still had the penile lesion. See id.

April 17, 2009, was an OR day at FMC Butner for Dr. Ogle and a make-up clinic date. Def. Tr. Ex. 9a; Def. Tr. Ex. 9b (Bates 2213, 2526); Def. Tr. Ex. 9c (Bates 319). MDI scheduled Baker for urology clinic on April 17, 2009, and Baker's name appears on the patient list for the urology clinic at the FMC, but the BOP did not transport Baker to the FMC. Def. Tr. Ex. 1 (Bates 1006); Def. Ex. Tr. 9b (Bates 2213).

Baker contends that he was not transported because the CTOs did not have his paper medical file. Baker also contends that by the time FMC Butner staff verified that Baker's file already was at FMC Butner, the CTOs already had taken the inmates for that day. Def. Tr. Ex. 18 (Bates 161, ¶¶ 21–22). In any event, the CTOs did not transport Baker to the urology clinic

27

on April 17, 2009.

On April 22, 2009, PA Burt saw Baker for a "follow-up encounter" at the Health Services Unit in FCI II. Def. Tr. Ex. 1 (Bates 32). No cosign was required. Id. 33. PA Burt documented that Baker "present[ed] with continued pain to glans penis. [Baker's] open wound is getting larger and has had no response from acyclovir. [Baker] continues to self-dilate 3x/week [3 times per week] and premedicates with Motrin 800. [Baker's] urology consult has been cancelled on numerous occasions for various reasons." Id. 32. PA Burt examined Baker and described Baker's penile lesion as "granulomatous lesion to the glans. It appears inflamed." Id. PA Burt noted that Baker was "to see urology Friday [April 24, 2009,] per AHSA." Id. 33. PA Burt offered Baker a jock strap, but Baker refused. Id. PA Burt renewed Baker's prescription for Ibuprofen. Id. 714.

On April 24, 2009, Dr. Ogle saw Baker in urology clinic at FMC Butner. Def. Tr. Ex. 3 (Bates 36). Dr. Ogle documented that Baker was a "44 [year old] old male [with] history of urethral stricture [status post] dilation on self dilation [2 times per week]." Id. Dr. Ogle noted that the "urethral biopsy [on January 13, 2009, was] negative. [Baker] recently finished acyclovir." Id. Dr. Ogle examined Baker and noted "ulceration right meatus." Id. Dr. Ogle did not believe that Baker's penis appeared to have cancer. Dr. Ogle diagnosed urethral stricture and "urethral lesion [with positive Herpes blood test result]." Id. Dr. Ogle ordered Baker to continue self-dilation 2 times per week for urethral stricture. Id. Dr. Ogle ordered Valtrex twice per day for one week for Baker's urethral lesion and a follow-up visit in one week. Id.

On April 28, 2009, at 0845, Dr. Mercado reviewed Dr. Ogle's note and ordered Acyclovir for one week. Def. Tr. Ex. 1 (Bates 37). On April 28, 2009, Dr. Mercado asked MDI to schedule a follow-up visit in urology clinic with Dr. Ogle "Within Same Week." Def. Tr. Ex.

1 (Bates 37, 42). Dr. Mercado noted that Dr. Ogle had evaluated Baker on April 24, 2009, and had ordered a follow-up visit in one week. Def. Tr. Ex. 1 (Bates 37).

The BOP promptly filled Baker's prescription for Acyclovir. Def. Tr. Ex. 34 (Bryan Decl. ¶ 7). On May 4, 2009, the prescription for Acyclovir was amended to add ten more days. Def. Tr. Ex. 34 (Bryan Decl. ¶ 7).

On April 28, 2009, at 1308, Dr. Mercado saw Baker in the Health Services Unit without an appointment because Baker complained that Motrin did not relieve his pain. Def. Tr. Ex. 1 (Bates 38–39). Dr. Mercado documented that Baker "has penile strictures for which he has been self cath[ing] himself. [Baker] was seen by Urologist last Friday [April 24, 2009] and [the urologist] recommended to give [Baker] treatment for herpes." Id. 38. Dr. Mercado ordered injectable pain medication (Toradol), three times per day for five days, through an insulin line. Id.

On April 30, 2009, PA Burt saw Baker in sick call/triage at the Health Services Unit at FCI II. Id. 40–41. Dr. Mercado cosigned the note. Id. 41. Baker wanted to know why he was receiving Acyclovir instead of Valtrex as Dr. Ogle ordered. See id. 40. Baker noted that his pain worsened with urination and that the Toradol injectable medication was not helping. Id. PA Burt noted that Baker had completed a course of Acyclovir. Id. PA Burt deferred physical exam to the urologist for the following day, but he described Baker's penis as "circumcised, left of os [circular opening at tip of penis where urine exits the body] large open wound, subdermal." Id. PA Burt noted that Baker is "followed by urology and" that Baker would be seen in urology the following day. Id. 40–41. PA Burt reordered Pyridium for two weeks and reordered pain medication, and indicated that he would submit a nonformulary request for Valtrex. Id. 40–41. PA Burt documented that the biopsy of the urethral stricture showed "dysplastic cells" but that

29

BOP medical personnel were "[a]wait[ing] direction from urology." Id. 41.

On May 1, 2009, Dr. Ogle examined Baker and noted that Baker was "on self dilation 2x/week [2 times per week]" and that he had "ulceration on right meatus **improved**." Def. Tr. Ex. 3 (Bates 42) (emphasis added). Dr. Ogle did not believe that Baker's penis appeared to have cancer. To treat Baker's urethral stricture condition, Dr. Ogle ordered dilation two times per week. To treat his "herpetic lesion," Dr. Ogle ordered Valtrex and noted that he would consider ordering a biopsy in two weeks if the lesion did not improve. Id. Dr. Ogle ordered a follow-up visit in two weeks. Id.

At Baker's visit on May 1, 2009, Baker claims that he told Dr. Ogle "[t]here still was no change in his condition. If anything [his] condition had deteriorated." Def. Tr. Ex. 18 (Bates 163, ¶ 32). Baker told Dr. Ogle of Baker's "constant and unbearable pain that he was experiencing and how it burned everytime he urinated because [the sore] was busted open several times daily." Id. Baker claimed that "it hurt like the worst type of toothache imaginable." Id. Dr. Ogle told Baker that he would consider a biopsy if there were no change, but Dr. Ogle feared that a biopsy "would cause the condition to become worse." Id.

On May 4, 2009, Dr. Mercado reviewed Dr. Ogle's orders and noted that the Central Office had disapproved Valtrex. Def. Tr. Ex. 1 (Bates 45). Dr. Mercado entered a request to MDI to schedule a follow-up visit with Dr. Ogle "Within Two Weeks." Id. 48. Dr. Mercado also ordered Acyclovir for 14 days because the BOP's Central Office had not approved the Valtrex. Id. 45.

On May 5, 2009, PA Burt saw Baker to discuss the "central office's denial of Valtrex and to assess [Baker's] wound." Id. 46–47. PA Burt noted that Dr. Ogle examined Baker in the urology clinic on May 1, 2009, and that Dr. Ogle felt the lesion was improving and

30

"recommended follow-up in 2 weeks with the possibility of biopsy." Id. 46. PA Burt noted that Baker disagreed with Dr. Ogle that the lesion was getting smaller. Id. Baker indicated that he was "still also experiencing resistance when he attempts to self-catheterize." Id. Baker told PA Burt that he was still taking Acyclovir and he requested additional pain medication. Id. PA Burt examined Baker and noted "Genitourinary – lesion to the right meatus is 1.5 cm a/p [anterior/posterior] and 1 cm deep with edges clearly demarcated. It is granulomatous appearing and beneath the dermis. The surface is erythematous." Id. PA Burt noted that Baker would follow-up with urology in two weeks and that he "spoke with Dr. Mercado about [Baker's] pain management requests. [PA Burt would] continue current plan plus attempt to get [Baker] a cup to avoid friction. AHSA notified about this request." Id.

On May 15, 2009, Dr. Ogle saw Baker in urology clinic and noted that Baker was a patient with "a history of herpes and urethral stricture treated with acyclovir." Def. Tr. Ex. 3 (Bates 48). Dr. Ogle examined Baker and noted "ulcerating lesion right distal meatus." Id. Although Dr. Ogle continued to believe that Baker's penis did not appear to have cancer, Dr. Ogle ordered a biopsy in the operating room at FMC Butner and a third blood test for herpes. Id. Baker told Dr. Ogle "that none of the medication were doing any good" and that he "suggested moving to a Plan B." Def. Tr. Ex. 18 (Bates 164, ¶ 35). According to Baker, "Dr. Ogle mentioned he thought [the penile lesion] had improved slightly," but Baker "strongly disagreed." Id. Baker alleges that he asked Dr. Ogle to move to Plan B because Baker had seen Dr. Ogle four times since February 13, 2009, and Baker had seen no improvement. Id. Baker asked Dr. Ogle why he was being treated for herpes. Id. Dr. Ogle told Baker that the original IgG test revealed herpes in his blood but not in his urine. Id. Baker told Dr. Ogle that herpes would show up in his urine because it would contaminate the sample. Id.

31

On May 20, 2009, Dr. Mercado reviewed Dr. Ogle's note and asked MDI to schedule Baker for the biopsy of the ulcerating urethral mass in the operating room at FMC Butner. Dr. Mercado also ordered the blood tests for Herpes Simplex Virus I and II. Def. Tr. Ex. 1 (Bates 49).

May 22, 2009, was an OR day at FMC Butner for Dr. Ogle. Def. Tr. Ex. 9c (Bates 320). Dr. Ogle's OR schedule, however, already was booked. Dates are set two weeks in advance. Def. Tr. Ex. 40 (Christ Decl. ¶ 11). Dr. Ogle did not override the schedule to perform a biopsy on Baker.

On May 28, 2009, Dr. Mercado renewed the Acyclovir prescription for 14 days at Baker's request. Def. Tr. Ex. 1 (Bates 700). The BOP promptly filled the prescription. Def. Tr. Ex. 34 (Bryan Decl. ¶ 14).

On May 28, 2009, Baker's BOP counselor, Mr. Garrido, "[e]-mailed the [MDI] scheduler to try and speed up the process of the biopsy ordered by Dr. Ogle on May 24, 2009." Def. Tr. Ex. 18 (Bates 165, ¶ 38).

On June 2, 2009, the third blood test ordered by Dr. Ogle was positive for herpes (HSV I/II). Def. Tr. Ex. 7 (Bates 50). On June 3, 2009, PA Burt saw Baker in sick call at FCI II for complaints of back pain. Def. Tr. Ex. 1 (Bates 696–98). PA Burt examined Baker and noted "suntanned skin" and "Genitourinary – His penile lesion appears to be slightly larger. Inflammed [sic] around the lateral edge." Id. 696. PA Burt prescribed a narcotic pain medication that Baker could obtain, twice per day, from the pill line. Id. 697. PA Burt noted that the biopsy of the lesion was pending. Id. PA Burt diagnosed lumbar strain and ordered an ultrasound of Baker's kidneys to rule out a renal cause of pain, which PA Burt noted to be "(less likely)." Id. PA Burt ordered "follow-up as scheduled . . . pending biopsy." Id.

32

On June 3, 2009, Dr. Mercado discussed Baker's case with the Clinical Director. Dr. Mercado noted that Dr. Ogle had an OR day scheduled at FMC Butner on Friday, June 5, 2009, but it was full, and Baker was not on Dr. Ogle's schedule. Id. 51; Def. Tr. Ex. 9c (Bates 321). The Clinical Director referred Dr. Mercado to the BOP OR scheduler. Def. Tr. Ex. 1 (Bates 51). Dr. Mercado spoke with the BOP OR scheduler and was informed that Dr. Ogle chose "the cases that he wanted to perform on Friday." Id. Dr. Ogle did not select Baker's case for his surgery schedule on June 5, 2009.

On June 5, 2009, Dr. Mercado asked MDI to schedule Baker for a biopsy evaluation by the MDI dermatologist "Within Two Weeks." Id. 61. Dr. Mercado noted that Baker was a patient with a history of "genital herpes as well as urethral strictures who after self cathing has developed a non healing ulcer on [right] urethral side. Please evaluate for biopsy." Id.

On June 8, 2009, the MDI dermatologist, Dr. Heinly, was signed into FMC Butner from 0725–1400. Def. Tr. Ex. 2 (Bates 2668); cf. Def. Tr. Ex. 10. The dermatology consult note states that Baker was a "No Show." Def. Tr. Ex. 1 (Bates 52).

On June 9, 2009, PA Burt documented that Baker missed his visit with the MDI dermatologist "due to institutional lockdown due to heavy fog." Id. 53. PA Burt noted that Baker would be rescheduled. Id. PA Burt also noted that Baker's urine-test report noted a urinary tract infection so PA Burt prescribed an antibiotic. Id. 692.

On June 10, 2009, an ultrasound of Baker's kidneys was unremarkable. Def. Tr. Ex. 8 (Bates 105).

On June 16, 2009, PA Burt noted that the "biopsy of [Baker's] penile lesion is pending MDI rescheduling due to fog watch." Def. Tr. Ex. 1 (Bates 54). PA Burt also noted that Baker signed up for sick call the previous day for back pain but that PA Burt had examined Baker last

week for this complaint and that Baker had a prescription for Percocet and Motrin for pain. Id. PA Burt noted that Baker would be scheduled for an appointment to see PA Burt "per [Baker's] request." Id.

On June 28, 2009, an EMT described Baker's penile lesion as "non red and doesn't show the signs of drainage or infection." Id. 687. On June 29, 2009, Dr. Mercado renewed Baker's prescription for Percocet. Id. 686.

On July 2, 2009, PA Burt conducted the preoperative medical clearance exam and cleared Baker for surgery. Id. 55–56. PA Burt noted that Baker "has a history of a urethral stricture that was surgically repaired which seems to be the inciting event for the lesion's appearance." Id. 55. PA Burt counseled Baker and noted that Baker was "aware of the procedure" and "verbalize[d] understanding." Id. 56.

On July 3, 2009, there was no urology clinic due to the Independence Day holiday.

On July 9, 2009, at 0725, a BOP nurse advised Baker not to take his nonsteroidal antiinflammatory pain medication until after the biopsy scheduled for July 17, 2009. Id. 683. Later that day, PA Burt saw Baker in sick call/triage. Id. 57–58. Baker complained of increased pain and drainage to his penile lesion. PA Burt noted that Baker was awaiting biopsy with Dr. Ogle, that Baker had been asked to stop taking the nonsteriodal pain medication due to the upcoming biopsy, and that Baker currently was taking Percocet twice per day. Id. 57. PA Burt examined Baker and documented that the "lesion on his penis measures 2.5 cm x 2 cm and appears to have increased in size and is more fungating" and was draining. Id. 58. PA Burt noted that the "[b]iopsy is pending and coming up soon." Id. PA Burt gave Baker large and small bandages to cover the lesion and contacted the health administrator to get an athletic cup for Baker. Id. PA Burt told Baker how to apply the bandages and Baker verbalized his

34

understanding. Id. PA Burt noted that he would ask Dr. Mercado about increasing Baker's pain medication. Id. On July 10, 2009, Dr. Mercado increased the "pain medication" because of PA Burt's findings. Id. 59.

On July 16, 2009, CTOs transported Baker to FMC Butner, where he remained until July 17, 2009. Def. Tr. Ex. 10. On July 17, 2009, Dr. Ogle performed the biopsy on the "penile mass." Def. Tr. Ex. 1 (Bates 60); Def. Tr. Ex. 3 (Bates 61); Def. Tr. Ex. 9c (Bates 322). Dr. Ogle testified that the biopsy was a diagnostic biopsy, not a staging biopsy. He ordered and performed the biopsy because Baker was not responding to the prescribed treatment for herpes. Dr. Ogle documented the mass to be a "2 x 2 cm fungating mass right distal glans." Def. Tr. Ex. 1 (Bates 61). Dr. Ogle performed the procedure in the operating room at FMC Butner under general anesthesia and penile block. Def. Tr. Ex. 3 (Bates 992). When Dr. Ogle performed the biopsy, Dr. Ogle did not believe that Baker's penis appeared to have cancer. Dr. Ogle did not write any orders for follow-up medical care or a return to urology clinic. Def. Tr. Ex. 1 (Bates 61).

On July 18, 2009, Dr. Ward issued Baker a new narcotic pain medication order for two days. Id. 678. On July 20, 2009, PA Burt reordered the narcotic pain medication and extended the prescription for 30 days. Id. 674–75. PA Burt examined Baker and noted that the penile lesion was dry, had no drainage, and had an "electrocautery scar over the lesion." Id. 674. PA Burt ordered continued dressing changes and self-cathing two times per week. Id. 675. PA Burt noted that BOP medical was "[a]wait[ing] pathology/paperwork from Dr. Ogle regarding plan for [follow-up]." Id. PA Burt also noted that that Dr. Mercado examined Baker. Id.

On July 20, 2009, Dr. Mercado noted that it appears that the electrocautery was applied to the lesion "after [the] biopsy was performed. On post procedure documents there is no

35

indication of plan to divert urine like [Baker] indicates he was told." Id. 673. Dr. Mercado noted that BOP medical personnel "[w]ill await for dictated version of [Dr. Ogle's] consult since we [are] only able to see what was scanned in OR into" the BOP's medical records system after the procedure and no orders for aftercare appeared in Dr. Ogle's handwritten consult note. Id.

On July 21, 2009, the pathology report revealed "squamous cell carcinoma, well differentiated, invasive (ICD9-173.5)." Def. Tr. Ex. 6 (Bates 62).

On July 24, 2009, at 1120, Dr. Mercado reviewed the pathology report. Def. Tr. Ex. 1 (Bates 64). Dr. Mercado ordered radiology imaging to rule out metastases and submitted the case for Tumor Board review on July 27, 2009. Id. Dr. Mercado also entered a request to MDI to "[f]ollow up with urologist **ASAP**, scheduler has been emailed to schedule [Baker] **ASAP**." Id. (emphasis added).

On July 24, 2009, at 1438, Dr. Mercado called Baker at two different inmate moves, but Baker did not come to Dr. Mercado's office. Id. 63. Dr. Mercado placed Baker on call-out for Monday, July 27, 2009, to explain the pathology results. Id.

On July 27, 2009, at 0855, Dr. Onuoha noted that the institution was on total lockdown and that Baker would be called to the Health Services Unit in FCI II when the lockdown was lifted. Id. 66. At 1038, Dr. Mercado discussed with Baker his cancer and the plan of care, and Baker verbalized his understanding. Id. 67–68. Dr. Mercado noted that Baker's case would be presented to the Tumor Board later that day, that a CT scan was pending, that Baker would see Dr. Ogle on July 31, 2009, and that she ordered pain medication and additional supplies for Baker to care for the biopsy site. Id.

On July 27, 2009, the Tumor Board reviewed Baker's case. Id. 69. Dr. Coughlin, the MDI Radiation Oncologist, "indicated he will be evaluating" Baker. Id.; Def. Tr. Ex. 13c.

36

On July 29, 2009, Dr. Coughlin examined Baker. Def. Tr. Ex. 1 (Bates 106–07). Dr. Coughlin presented the treatment options to Baker of either penile amputation or an evaluation for a Mohs procedure. Baker elected to postpone penile amputation until after a Duke dermatologic oncologist, Dr. Cook, evaluated the possibility of Mohs surgery. Id. Dr. Coughlin noted that he had spoken with Dr. Cook and that Dr. Cook indicated that he would need to see Baker before he could advise whether a Mohs procedure "would be indicated as opposed to distal penectomy." Id. Dr. Coughlin submitted to MDI a request for consult with a dermatologic oncologist at Duke for evaluation, noting that Baker "need[ed] to see Moh[]s surgeon **asap**." Id. 70, 110 (emphasis added).

On July 30, 2009, the FCC Butner Utilization Review approved Dr. Coughlin's request for Baker to seek evaluation at Duke Dermatology. Id. 958–60. On July 31, 2009, Dr. Ogle examined Baker and ordered radiology imaging **ASAP** and a follow-up in one week. Id. 72. Dr. Mercado already had ordered this imaging on July 24, 2009. Id. 64.

On August 3, 2009, the CT scan of Baker's abdomen and pelvis revealed no metastases. Def. Tr. Ex. 8 (Bates 108).

On August 6, 2009, Dr. Onuoha submitted a request to MDI to schedule Baker for a follow-up visit with Dr. Ogle by August 13, 2009. Def. Tr. Ex. 1 (Bates 74). August 7, 2009, was an OR day at FMC Butner for Dr. Ogle, and no urology clinic was held. Def. Tr. Ex. 9c (Bates 323).

On August 7, 2009, PA Burt saw Baker in sick call/triage to have supplies ordered. Def. Tr. Ex. 1 (Bates 75–76). Baker "wonder[ed] why he [was] not going to see urologist today." Id. 75. PA Burt noted that BOP medical personnel are "[a]waiting treatment plan from Dr. Ogle." Id. PA Burt also noted that the BOP's computer system indicated that Baker had an appointment

37

to see Dr. Ogle the following week. Id. 76. Dr. Ogle, however, did not hold urology clinic on August 14, 2009. Def. Tr. Ex. 9a.

On August 17, 2009, PA Burt was notified that CTOs would transport Baker to Duke Dermatology Clinic on August 21, 2009, for evaluation to see if the Mohs procedure was viable. Thus, Baker's August 21, 2009 appointment with Dr. Ogle had to be "rescheduled to the following Friday or sooner if [Dr. Ogle would be] here before that." Def. Tr. Ex. 1 (Bates 78). PA Burt noted that he had "emailed MDI scheduler." Id.

On August 18, 2009, Dr. Ogle held urology clinic at the FMC. Def. Tr. Ex. 9b (Bates 2248). The MDI scheduler did not put Baker on the schedule.

On August 21, 2009, Dr. Ogle did not show up for urology clinic; therefore, all patients had to be rescheduled for August 28, 2009. Def. Tr. Ex. 1 (Bates 82, 90); Def. Tr. Ex. 9b (Bates 2249). Duke also notified the BOP that, due to Dr. Cook's schedule, it was rescheduling the August 21, 2009 Mohs evaluation visit. See Def. Tr. Ex. 1 (Bates 79, 82).

On August 25, 2009, Dr. Onuoha saw Baker because of Baker's Inmate Request to Staff that Baker sent to several staff. Id. 80. Dr. Onuoha explained that the request to see Dr. Cook was timely and that Dr. Coughlin had spoken with Dr. Cook. Id. Dr. Onuoha changed Baker's pain medication to a patch for continual relief and reordered supplies for Baker. Id. Dr. Onuoha explained to Baker that, because he was not on active cancer medication, Baker did not meet the criteria to be admitted as an inpatient to one of the hospital units in FMC Butner. Id. Baker understood Dr. Onuoha's discussion with him. Id.

On August 28, 2009, Dr. Ogle examined Baker and recommended "distal penal amputation ASAP." Id. 81. Dr. Ogle discussed the risks with Baker. Id.

On August 31, 2009, PA Burt contacted the town-trip coordinator to see when Baker was

38

scheduled to see Dr. Cook concerning a possible Mohs procedure. Id. 83. The town-trip coordinator advised that Baker's appointment with Dr. Cook was rescheduled to September 14, 2009. Id. PA Burt "emailed her back to make sure this was the absolute earliest appointment available and made her aware of the expedient nature of this." Id.

On August 31, 2009, Dr. Onuoha reviewed Dr. Ogle's August 28, 2009 note. Id. 84–85. Dr. Onuoha ordered a preoperative chest x-ray and Dr. Onuoha submitted a request to MDI to schedule a urology appointment for "[p]re-op for distal penile amputation for penile cancer" by the end of the day. Id.

On September 1, 2009, PA Burt called Baker to his office to discuss Baker's "treatment options for his penile cancer." Id. 645–47. The radiation oncologist and the Tumor Board suggested evaluation by a dermatologic oncologist for a Mohs procedure. Id. 645. Baker "[h]ad been scheduled [for evaluation] since the tumor board meeting but [the appointment with Duke's Mohs surgeon] had to be rescheduled per Duke." Id. In the meantime, Dr. Ogle "recommended penile amputation ASAP." Id. PA Burt contacted Dr. Coughlin to see if "he had any input that might help [Baker] make a treatment decision." Id. Dr. Coughlin opined that the "Mohs surgery may require resection of just as much of [Baker's] penis than an amputation," and Dr. Coughlin noted that Baker was "only scheduled to go [to Duke] on 9/14/09 for an evaluation, not the actual [Mohs] surgery." Id. "Duke ha[d] been contacted by MDI and [wa]s unable to move his [appointment] date sooner." Id. Baker "was given his options of distal penile amputation ASAP vs waiting until 9/14/09 . . . for Mohs surgery." Id. PA Burt discussed with Baker "what Mohs surgery is as well as potential prosthesis/plastic surgical interventions potentially available." Id. 646. "Dr. Onuoha was involved in [the] . . . conversation with [Baker]." Id. Baker said he would think about his options and would report to clinic tomorrow to let PA Burt know his

treatment decision. Id. 645.

On September 2, 2009, Baker told PA Burt that he decided to wait for the Mohs surgery evaluation. Id. 88. Baker was "aware of the risks associated with this and has been presented with a refusal form. [Baker] declined to sign this form, stating that he didn't have enough time to make the decision. Mr. Overmiller (pharmD) was in to witness this encounter." Id. 88, 91.

On September 2, 2009, PA Burt documented that he followed up on Baker's assertion that Baker's "appointment with Duke was cancelled by Butner staff in order to accommodate Dr. Ogle's schedule." Id. 90. PA Burt researched this allegation "and discovered from town trip coordinator that [Baker's] initial appointment for 8/21/09 was cancelled because MD was out of the office and was rescheduled for 8/28/09. This trip was cancelled by Lt. Council due to emergencies." Id. The appointment "was then rescheduled for 9/14/09 and when [Duke was] called to see if an earlier appointment was available, there was not one." Id.

On September 14, 2009, Dr. Cook, the Duke dermatologist-oncologist, concluded that Baker was not a candidate for Mohs surgery due to the size, depth, and proximity of the tumor to the urethra. Def. Tr. Ex. 4 (Bates 1431). Dr. Cook informed Baker that brachytherapy (a form of radiation), which would require a separate evaluation, might be an option. Id.

On September 15, 2009, PA Burt discussed with Baker the options of brachytherapy or penile amputation. Def. Tr. Ex. 1 (Bates 92). PA Burt advised Baker that it would take time to get brachytherapy scheduled after any brachytherapy evaluation, but that the penile amputation could be scheduled soon. Id. Baker elected to wait for a brachytherapy evaluation. Id. PA Burt entered the request to MDI to schedule an evaluation for brachytherapy with Duke Urology. Id. 93, 110.

On September 21, 2009, the BOP noted that Baker's fentanyl (narcotic pain) patch had

been tampered with. Id. 637–38. On September 21, 2009, PA Burt saw Baker in the chronic care clinic. Id. 94–97. PA Burt noted that Dr. Cook referred Baker to a brachytherapy specialist at Duke, and that the appointment was pending for late that week. Id. 94. PA Burt noted that if the doctor decided that Baker was not a candidate for brachytherapy, Baker would be referred immediately to Dr. Ogle for penile amputation. Id. PA Burt noted that Baker had been "heavily informed and involved in treatment planning and decision making each step of the way." Id.

On September 23, 2009, CTOs transported Baker to Duke for evaluation for brachytherapy by Duke urologist-oncologist Dr. Inman. Def. Tr. Ex. 5a (Bates 1433–35). Dr. Inman amended his initial dictated record of this visit specifically to note that Baker's penile cancer "is a very unusual situation given that he is circumcised." Compare id. 114 (printed September 23, 2009 at 9:15 pm), with id. 1434 (electronically signed on September 25, 2009 at 7:49 am). Dr. Inman noted that the CT scan "did not show any evidence of spread." Id. 1434. Dr. Inman determined that the bracytherapy was not an option and that the only option for survival was a partial penectomy. Id. Dr. Inman discussed all of the risks with Baker, told him of the immediate need for the surgery, and admitted him to Duke. See id. 1434–35.

On September 24, 2009, Dr. Inman performed a partial penectomy, repeat urethral dilation, cystourethroscopy, and transurethral biopsy of urethra on Baker at Duke. Id. 1448.

On September 26, 2009, Baker returned from Duke and was housed on Unit 5B at FMC Butner. Def. Tr. Ex. 5c (Bates 99); Def. Tr. Ex. 1 (Bates 625). The pathology report revealed "carcinoma of glans penis: squamous cell carcinoma" (SCC). Def. Tr. Ex. 6 (Bates 1451). Dr. Inman ordered that a chest x-ray and CT scan be performed before the follow-up visit in two to four weeks. Def. Tr. Ex. 5c (Bates 1453).

After Baker returned to FCC Butner following his partial penectomy, he was housed in

41

hospital bed units at FMC Butner until his release from BOP custody in March 2010:

    09/26/09-09/30/09 - Unit 5B
    09/30/09-11/18/09 - Unit 4B
    11/18/19-11/19/09 - Unit 3B
    11/25/09-01/15/10 - Unit 5B
    01/15/10-03/10/10 - Unit 5C

See Def. Tr. Ex. 23 (Cox Decl. ¶ 5).

On October 6, 2009, the CT scan was performed at FMC Butner. Def. Tr. Ex. 8 (Bates 927–28). On October 15, 2009, the chest x-rays were performed at FMC Butner. Id. 907.

The August and October 2009 CT scans failed to document any metastases. Id. 108, 927–28; Def. Tr. Ex. 5c (Bates 1460). A renal ultrasound in June 2009 also failed to document metastasis. Def. Tr. Ex. 8 (Bates 105); Def. Tr. Ex. 5c (Bates 1460).

On October 16, 2009, the BOP transported Baker to a follow-up visit with Dr. Inman at Duke. Def. Tr. Ex. 5a (Bates 1436–37). Dr. Inman noted that Baker "reports doing very well. He is taking good care of his penile stump and has had no major complications since our last visit with no major symptoms." Id. 1436. Dr. Inman documented that he discussed with Baker "the prognosis of his penile cancer with regards to survival" and "the possibility of having inguinal [groin] lymph node involvement." Id. 1437. Dr. Inman discussed inguinal and pelvic lymphadenectomy, or the removal of lymph nodes from the groin and pelvis, and the "potential complications [of lymphadenectomy] including bleeding, infection, chronic lymphedema, skin flap necrosis, vascular and nerve injury, and the possibility of chronic pain and drainage." Id. Dr. Inman documented that Baker "understands and accepts these risks." Id. Dr. Inman also discussed with Baker "future management with regard to his penile cancer and the requirement for frequent examination and imaging." Id. Dr. Inman further noted that he prescribed an antibiotic "[b]ecause of the risks of infection associated with lymphadenectomy." Id.

42

On November 6, 2009, the BOP transported Baker to a preoperative visit with Dr. Inman at Duke. Id. 1438–39. Dr. Inman again documented that "[w]e discussed today the risks and benefits of [the lymphadenectomy] procedure including infection, bleeding, chronic lymphedema, skin loss, DVTs, and the possibility that the cancer could still come back. [Baker] understands this. [Baker] understands the rationale of both diagnostic and therapeutic for inguinal lymphadenectomy." Id. 1439. Dr. Inman noted that the plan was to perform this procedure in two weeks. Id. Dr. Inman noted that Baker was "having recurrent urinary symptoms [which] suggest re-stricture of his urethra." Id.

On November 19, 2009, Dr. Inman performed a lymphadenctomy and removed 31 lymph nodes from both sides of Baker's groin and performed repeat dilation of Baker's urethra. Def. Tr. Ex. 5b (Bates 1455–56). All 31 lymph nodes were negative for cancer; therefore, Dr. Inman did not perform a pelvic lymphadenectomy. Id. 1456; Def. Tr. Ex. 6 (Bates 1457–59).

On November 22, 2009, while hospitalized at Duke, Baker developed a fever and underwent a fever work-up. Def. Tr. Ex. 5c (Bates 1461). Baker "was started and kept on antibiotics throughout the hospital course to treat for this infection and subsequently his fever subsided." Id.

On November 25, 2009, Baker was discharged with two Jackson Pratt ("JP") drains, one in each groin "close to the incision site for adequate drainage," and Baker was transported back to Unit 5B of FMC Butner (a hospital bed unit). Id.; Def. Tr. Ex. 1 (Bates 593, 1175–77). Both surgical incision sites were open to the air. Def. Tr. Ex. 1 (Bates 1177). Baker also had bilateral lower extremity edema (swelling). Id. 1176.

On November 26, 2009, at 2252, a hospitalist at FMC Butner noted some leakage to the left JP drain due to the way it was taped in place. Id. 1143.

43

On November 27, 2009, at 0300, Dr. Ward examined Baker's left JP drain and noted that, although the JP drain was damaged, Baker was in no immediate danger. Id. 1144. Dr. Ward "noted early signs of infection at the right groin incision and ordered twice daily dressing changes with Bacitracin ointment and Telfa [bandage that does not stick to skin]." Id. Baker "disagreed and became belligerent." Id. "Baker's surgical sites were cleaned and bandaged according to doctor's order and [Baker] was advised to stop manipulating the drains and bandages." Id. Later, Baker called the nurses station and told them that he could not breathe and requested supplemental oxygen, which he had been prescribed. Id. 1145. The nurse assessed Baker and informed him that the oxygen cannula (delivery hose) was hanging around his neck ready for use. Id. Baker then complained that his JP drain was leaking, and an exam revealed that Baker had "removed all dressings placed by the nurse and Baker, again, had been manipulating the drains." Id. 1146.

On November 27, 2009, PA Brooks noted that Baker complained that his left JP drain was not "holding suction," so the drain bulb was changed and the JP drained. Id. 591–92. BOP medical providers contacted Dr. Inman's office at Duke, which referred the BOP medical providers to the Duke on-call resident physician to obtain postoperative direction and to update the plan of care. Id. 591. PA Brooks examined Baker and noted "[bilateral] groin area noted post surgical swelling and noted erythema [redness] without exudate [drainage/pus] from incision sites. Right J-P draining well and left J-P without suction and excessive amounts of fluid coming from his drain port." Id. 592. Dr. Bonner ordered Baker transferred to Duke because Baker's left JP drain was leaking and his postsurgical wounds were painful and red. Id. 1147.

On November 27, 2009, the BOP transported Baker to the Duke Emergency Department.

Def. Tr. Ex. 5e (Bates 4146–51). Baker told the resident physician that his left JP drain lost suction and that he was having increased swelling and pain in his proximal left thigh. Id. 4146. The resident physician examined Baker and noted "swelling to both prox[imal] thighs, worse on left with mild erythema." Id. 4147. The differential diagnosis was a "drain problem." Id.

A Duke nurse documented that she provided lidocaine and sutures to a Duke general-surgery physician whose "plan [was] to advance the JP to facilitate drainage." Id. 4150. The Duke attending physician documented that he personally interviewed and examined Baker and discussed the findings and interventions with the resident physician. Id. 4147. The attending physician noted "Urology has seen and will suture in place. If [the JP drain] falls out, no indication for return, just keep [follow-up] appointment with Dr. Inman." Id. 4147. The emergency department chart included miscellaneous instruction 1: "If your drain falls out, you do not need to come to the Emergency Department. Follow up with Dr. Inman as scheduled." Id. The attending physician discussed the treatment plan with Baker and the transporting officer, both of whom verbalized understanding, and Baker was given written instructions. Id. 4150. Baker returned to FMC Butner. Def. Tr. Ex. 10.

On November 28, 2009, Dr. Murphy assessed Baker. Def. Tr. Ex. 1 (Bates 1148). Baker complained of inadequate pain medication. Id. Dr. Murphy examined Baker and noted "Groin area: JP drain [complete with] serosanguinous." Id. Dr. Murphy also noted that Baker's left edema was greater than the right edema, but that there was no increased warmth or redness. See id.

On November 29, 2009, Dr. Linzau assessed Baker for swelling of his medial left thigh and no drainage from the left JP drain. Id. 1149–50. Dr. Linzau noted "a large fluctuant mass on the medial aspect of left thigh red and very tender. JP drain in place and apparently

45

malfunctioning." Id. 1149. The assessment was questionable abscess formation or postoperative fluid collection. Id. Dr. Linzau ordered Baker transported to Duke. Id.

On November 29, 2009, Baker was admitted to Duke and remained there through December 4, 2009. Def. Tr. Ex. 5c (Bates 1463). Baker's physical exam at Duke revealed that his JP drains were in place, and that there was extensive redness and warmth to the touch in Baker's left groin, with a 2–3 cm area of a "fluctuant mass that is relatively superficial and tender to palpation." Id. 1464. The left groin fluid was tested and revealed MRSA, which was treated with antibiotics. Id. On the third day of admission, Baker's left JP drain started leaking, reinforcement was applied, and the fluctuant mass appeared to get larger. Id. Later, the JP drain was "accidentally pulled out a few inches" and began leaking more. Id. The JP drain was replaced the next day using an ultrasound to guide its placement into the fluid mass. Id. Duke medical personnel inserted an IV line so that Baker could receive four additional weeks of antibiotics at FMC Butner to treat the MRSA. Id.

On December 4, 2009, Baker was discharged from Duke with a diagnosis of "[left] thigh/groin abscess cellulitis and [status post] drain placement." Id. 1235. Duke personnel ordered that the JP drain be flushed daily and that the JP bulb be emptied daily. Id. Baker returned to hospital Unit 5B at FMC Butner. Def. Tr. Ex. 1 (Bates 1150). A BOP nurse noted that both of Baker's JP drains were patent (flushed easily) and that he had at least two pitting edema of both his lower extremities. Id. The nurse also noted that Baker's "[right] groin has signs of infection including redness and ulcer formation." Id.

From December 4 through December 16, 2009, Baker was housed in the inpatient hospital unit at FMC Butner, which provides hospital-based, 24-hour-per-day medical care. Def. Tr. Ex. 37 (Duchesne Decl. ¶ 13). From December 10 through December 16, 2009, nursing staff

assessed Baker at least twice daily and a physician assessed him daily. Id. ¶¶ 13, 14. Baker received antibiotics and pain medication as ordered and his JP drain was flushed three times per day. Id. ¶ 14.

At FMC Butner, only licensed healthcare personnel, including registered nurses, licensed practical nurses, nurse practitioners, physician assistants, or physicians, work with a patient's JP drains. Id. ¶ 10. Baker's complaints regarding his JP drains, from December 10 through December 16, 2009, were evaluated by nurses, mid-level providers, and physicians. Id. ¶¶ 10, 14.

On December 16, 2009, the nurse who changed Baker's dressing noted that Baker's JP drain had become dislodged. Def. Tr. Ex. 1 (Bates 1162). That same day, the BOP transported Baker to Duke for a follow-up visit with Dr. Inman. Def. Tr. Ex. 10. Dr. Inman found that Baker's left leg was swollen to twice the size of the right leg and the JP drain was not in the wound. Def. Tr. Ex. 5a (Bates 1440). Dr. Inman admitted Baker to Duke and believed that Baker might have a blood clot in his left leg. See id. 1441.

On December 17, 2009, Baker received a new JP drain. Def. Tr. Ex. 5c (Bates 1443). Baker was treated with IV antibiotics, his legs were wrapped, the right JP drain was removed when drainage disappeared, and the left JP drain was replaced on December 24, 2009. Id. Baker's scrotum remained swollen "as it had been in the past hospitalization." Id. Six days into the admission, the Duke Infectious Disease service noted that Baker had been receiving "subtherapuetic dosing" of antibiotics while hospitalized so Duke Urology increased the dosage. Id. 1443, 4096. On January 15, 2010, after Baker's "left thigh edema was greatly improved" and the drainage from the left JP drain was small, Duke discharged Baker and the BOP transported him back to FMC Butner. Id. 1443; Def. Tr. Ex. 1 (Bates 562).

On February 19, 2009, the BOP transported Baker for a follow-up visit with Dr. Inman. Def. Tr. Ex. 5a (Bates 1445–46). Dr. Inman recorded that Baker "reported that he is doing much better." Id. 1445. Dr. Inman noted that the swelling in Baker's groin "has gone down substantially." Id. Dr. Inman also noted that Baker had developed swelling in his legs that was "lymphedema related to the chronic obstructions that he has developed following the complicated postoperative course. I think that this is all going to resolve, but it is going to take months for [Baker] to get over the complicated postoperative course that he has had." Id. Dr. Inman removed the JP drain from Baker's left groin. Id. 1446. Dr. Inman noted that Baker was "finally doing well" and Baker "just needs to allow his healing to take place." Id.

On March 10, 2010, Baker was released from BOP custody. Def. Tr. Ex. 23 (Cox Decl. ¶ 3). Baker returned to Ohio.

From September 2010 through the trial date, Dr. Paula Weisenberger, an oncologist, treated Baker in Ohio. See Def. Tr. Ex. 22. Oncologists are not surgeons. Dr. Weisenberger did not testify at trial. Since Baker's release from prison, Baker's cancer has not recurred.

At trial, Baker produced no evidence of any mental-health treatment. Baker testified, however, that he discussed his anxiety and feelings of depression with Dr. Weisenberger. Nonetheless, he does not want psychiatric or psychological treatment because he does not like to discuss his medical situation or his feelings about his medical situation. Dr. Hatcher testified at trial that patients who have penile cancer and are treated with a partial penectomy and a lymphadenectomy often get depressed or anxious about their cancer, their fear that the cancer will recur, their fear about the treatment of their penis and their cancer, their penile disfigurement, their sexual dysfunction, and their fear of future medical treatment.

II.

Under the FTCA, the United States waives sovereign immunity for "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2675(a). Because the statute "requires the law of the place where the act or omission occurred to be applied," North Carolina substantive law controls Baker's negligence claim. See, e.g., Cibula v. United States, 551 F.3d 316, 319 (4th Cir. 2009) (quotation omitted); 28 U.S.C. § 1346(b).

In order to prevail on his negligence claim, Baker must prove by a preponderance of the evidence the essential elements of negligence: duty, breach of duty, proximate cause, and damages. See, e.g., Camalier v. Jeffries, 340 N.C. 699, 706, 460 S.E.2d 133, 136 (1995); Miller v. Henry, 270 N.C. 97, 99–100, 153 S.E.2d 798, 800 (1967). Baker must meet his burden of proof on each element. See, e.g., Clark v. Perry, 114 N.C. App. 297, 304–05, 442 S.E.2d 57, 61 (1994); Lowery v. Newton, 52 N.C. App. 234, 237, 278 S.E.2d 566, 570, disc. rev. denied, 303 N.C. 711, 278 S.E.2d 711 (1981).

> The parties dispute proximate cause.

> Proximate cause has been defined as a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequence of a generally injurious nature, was probable under all the facts as they existed.

Adams v. Mills, 312 N.C. 181, 192–93, 322 S.E.2d 164, 172 (1984) (quotation omitted); see Lynn v. Overlook Dev., 328 N.C. 689, 696, 403 S.E.2d 469, 473 (1991). "[P]roximate cause is ordinarily a question of fact for the [factfinder], to be resolved by the exercise of good common sense in the consideration of the evidence of each particular case." Williams v. Carolina Power & Light Co., 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979) (quotation omitted); Gaines ex rel.

49

Hancox v. Cumberland Cnty. Hosp. Sys., Inc., 203 N.C. App. 213, 219, 692 S.E.2d 119, 122 (2010); Hill v. Williams, 144 N.C. App. 45, 56, 547 S.E.2d 472, 479 (2001).

Proximate cause requires reasonable foreseeability. See, e.g., Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 232, 311 S.E.2d 559, 564 (1984). Although a plaintiff need not prove the precise injury he suffered was foreseeable, a defendant is not liable for events which are "merely possible." Williamson v. Liptzin, 141 N.C. App. 1, 10–11, 539 S.E.2d 313, 319 (2000); see also Thomas v. Weddle, 167 N.C. App. 283, 286, 605 S.E.2d 244, 246–47 (2004). As the Supreme Court of North Carolina explained in Phelps v. City of Winston-Salem, 272 N.C. 24, 157 S.E.2d 719 (1967):

> The law does not charge a person with all the possible consequences of his negligence, nor that which is merely possible. A man's responsibility for his negligence must end somewhere. If the connection between negligence and the injury appears unnatural, unreasonable, and improbable in the light of common experience, the negligence, if deemed a cause of the injury at all, is to be considered a remote rather than a proximate cause. It imposes too heavy a responsibility for negligence to hold the tortfeasor responsible for what is unusual and unlikely to happen or for what was only remotely and slightly probably.

Id. at 30, 157 S.E.2d at 723. Moreover, an intervening cause insulates an originally-negligent actor from liability when it makes the original negligence a remote rather than a proximate cause of the resultant injury. See Hairston, 310 N.C. at 236, 311 S.E.2d at 566; Sloan v. Miller Bldg. Corp., 128 N.C. App. 37, 44, 493 S.E.2d 460, 465 (1997). Furthermore, another independent force, unassociated with a defendant's initial negligence, may insulate the defendant from liability if the new proximate cause breaks the connection between the original cause and the result and becomes itself solely responsible for the resultant injury. Riddle v. Artis, 243 N.C. 668, 671, 91 S.E.2d 894, 896 (1956). Where such a break occurs, the original negligence no longer is the proximate cause of the injury but merely has created the circumstances under which the injury occurred. See id. at 671, 91 S.E.2d at 896–97; Tabor v. Kaufman, 196 N.C. App. 745,

748, 675 S.E.2d 701, 703 (2009); Barber v. Constien, 130 N.C. App. 380, 385–86, 502 S.E.2d 912, 916 (1998).

In assessing an original actor's negligence and what an original actor is expected reasonably to foresee, an actor "is not bound to anticipate negligent acts or omissions on the part of others; but, in the absence of anything which gives, or should give notice to the contrary, he is entitled to assume and to act upon the assumption that every other person will perform his duty . . . ." Weavil v. Myers, 243 N.C. 386, 391, 90 S.E.2d 733, 737–38 (1956) (citations omitted). In the context of medical treatment, North Carolina rejects the rule that "subsequent negligent medical treatment is foreseeable as a matter of law" and "persons who wrongfully injure another are liable as a matter of law for the subsequent malpractice of health care providers who attempt to treat the original injury." Barber, 130 N.C. App. at 384, 502 S.E.2d at 915.

A.

Before his incarceration at FCC Butner on September 8, 2008, Baker had a four-year history of urologic symptoms, including restricted urine flow. Upon Baker's arrival at FCC Butner, BOP medical personnel noted that Baker had "redness to urethral meatus," the end of the urethra, which opens at the tip of the penis to permit urine to exit the body. BOP medical personnel asked MDI to schedule Baker to see MDI's independent-contractor urologist, Dr. Ogle, to treat Baker's urologic symptoms.

On December 19, 2008, Dr. Ogle examined Baker. On the first visit, Dr. Ogle described Baker's urethral stricture and ordered a surgical dilation. Dr. Ogle also noted an "ulceration right meatus," for which Dr. Ogle ordered a blood test for herpes.

On January 13, 2009, Dr. Ogle performed a urethral dilation and a biopsy of the urethral stricture at a community hospital. Dr. Ogle's orders to the BOP for the postoperative care of

51

Baker included only an indwelling catheter and an antibiotic (Bactrim), both for five days. Dr. Ogle's postoperative orders did not include an order for Baker to return to the urology clinic for any follow-up care. The medical records document that the BOP implemented both orders: Bactrim and an indwelling catheter for 5 days. Moreover, the biopsy of the urethral stricture was negative for cancer.

Baker contends that the United States engaged in a pattern of negligence in providing medical care to Baker and focuses on three distinct time periods. First, he contends that the United States negligently failed to provide proper care to Baker from February 13, 2009, through April 24, 2009. Second, he contends that the United States negligently failed to provide proper care to Baker from April 24, 2009, to May 15, 2009. Third, he contends that the United States negligently failed to provide proper care to Baker after his lymphadenectomy.

Turning to the first time period, Baker alleges that the United States breached a duty of care and committed ordinary negligence in failing to follow Dr. Ogle's January 2009 postoperative orders for self-catheterizing supplies and Pyridium, an antispasmodic which would have helped sooth Baker's urogenital muscles when he catheterized. Dr. Ogle, however, never wrote such orders in the postoperative records. Thus, Baker failed to meet his burden of proof on this negligence claim.

Baker also alleges that the United States committed ordinary negligence when it failed to transport him for a postoperative follow-up visit with Dr. Ogle within two weeks of the January 13, 2009 urethral dilation. Dr. Ogle's postoperative records, however, do not reflect that Dr. Ogle wrote an order for any follow-up visit in the urology clinic. Nonetheless, on January 14, 2009, the BOP submitted a request to MDI to schedule Baker to be seen in the urology clinic for a follow-up visit with Dr. Ogle within two weeks. Furthermore, MDI scheduled Baker to be

seen in the urology clinic on February 13, 2009.

On February 13, 2009, the BOP transported Baker to see Dr. Ogle. When Dr. Ogle examined Baker on that date, the positive results for the first blood test for herpes were available on the computer. Baker complained to Dr. Ogle of decreased urine stream and penile discharge. Dr. Ogle noted Baker's urethral stricture for which he ordered Baker to self-catheterize (self-dilate the urethra) once per week. Dr. Ogle described Baker's ulceration on the right meatus and, for the discharge, he ordered both a culture of the discharged fluid and a second blood test for herpes. Dr. Ogle ordered Baker to return to the urology clinic for a follow-up visit in two weeks. Dr. Ogle did not believe that Baker's penis appeared to have cancer.

The BOP failed to transport Baker to medical appointments with Dr. Ogle from February 27, 2009, through April 24, 2009. MDI scheduled Baker to be seen in the urology clinic on March 6, 2009, and April 17, 2009, but BOP CTOs did not transport Baker because Baker's paper medical record was not available to be transported along with Baker. BOP CTOs transported Baker to the urology clinic on April 10, 2009. Dr. Ogle, however, did not attend clinic because it was Good Friday, and Dr. Ogle mistakenly thought that Good Friday was a federal holiday and specialty clinics would not be held at FMC Butner.

On April 13, 2009, the BOP ordered and filled a prescription for Baker for Acyclovir for 10 days to treat herpes. On April 24, 2009, the BOP transported Baker to the urology clinic. Dr. Ogle examined Baker on that date. Dr. Ogle noted Baker's history of positive herpes blood tests, urethral dilation and urethral biopsy, and that the biopsy results were "negative." Dr. Ogle also noted that Baker had just completed a cycle of Acyclovir but still had ulceration of the right meatus. For Baker's "urethral lesion," Dr. Ogle ordered a third blood test for herpes and Valtrex for one week. Dr. Ogle did not believe that Baker's penis appeared to have cancer.

Baker alleges that the BOP failed to follow Dr. Ogle's orders when the BOP substituted Acyclovir, a generic medicine, for the brand-name medication, Valtrex. The evidence, however, demonstrates that the human body does not recognize a difference between these two medications once they are ingested. Furthermore, decisions regarding the proper medication to prescribe to treat a patient fall within the ambit of professional medical judgment. See, e.g., Littlepaige v. United States, 528 F. App'x 289, 294 (4th Cir. 2013) (unpublished); Muhammad v. United States, No. 5:11-CT-3126-FL, 2012 WL 3957473, at *4–7 (E.D.N.C. Sept. 10, 2012) (unpublished); Moore v. U.S. Parole Comm'n, No. 3:07CV112-01-MU, 2007 WL 952018, at *1 (W.D.N.C. Mar. 27, 2007) (unpublished); Alston v. Granville Health Sys., 221 N.C. App. 416, 420–21, 727 S.E.2d 877, 880–81 (2012); Deal v. Frye Reg'l Med. Ctr., Inc., 202 N.C. App. 584, 2010 WL 522727, at *2–3 (N.C. Ct. App. 2010) (unpublished table opinion). All claims based on professional medical negligence have been dismissed due to Baker's failure to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure. Accordingly, this claim fails. See [D.E. 41]. In any event, because Acyclovir and Valtrex treat herpes, not cancer, Baker fails to meet his burden to demonstrate that the BOP's substitution of a generic pharmacologic-equivalent medication for herpes proximately caused the injuries resulting from Baker's squamous cell cancer of the penis.

The BOP transferred Baker to see Dr. Ogle on May 1, 2009, and May 15, 2009. On May 1, 2009, Dr. Ogle noted that the "Herpetic ulceration" appeared "improved," but Dr. Ogle reordered Valtrex and noted the need to consider ordering a biopsy. On May 15, 2009, Dr. Ogle described Baker as a patient with a history of herpes and urethral stricture. Dr. Ogle described Baker's penis as having a "urethral mass." Baker asserts that at each of the April and May 2009 visits with Dr. Ogle, he informed Dr. Ogle of the delay in seeing him, questioned Dr. Ogle's

54

treatment of Baker for herpes, and noted that his penile lesion was growing and was increasingly painful. In May 2009, Dr. Ogle did not believe that Baker's penis had cancer, but recognized that his treatment of Baker's herpes did not appear to be working. Thus, for diagnostic purposes, Dr. Ogle ordered a biopsy of the penile mass. Notably, Dr. Ogle would perform the biopsy in the operating room at FMC Butner, but did not order that the biopsy be scheduled "ASAP." In stark contrast, on December 18, 2008, Dr. Ogle ordered that the urethral dilation be scheduled ASAP.

Baker contends that the BOP negligently failed to transport him to see Dr. Ogle between February 13, 2009, and April 24, 2009. The court finds that the BOP should have transported Baker to see Dr. Ogle at his scheduled appointments during this time period. Nonetheless, Baker failed to meet his burden of proof on proximate cause for his negligence claim against the United States. Specifically, Baker failed to prove, by a preponderance of the evidence, that an ordinary prudent person, during the time period of February 13, 2009, through April 24, 2009, would have reasonably foreseen that failing to transport a patient, who was being treated by a board-certified urologist and who had been diagnosed with urethral strictures and herpes, to two visits with a urologist would result in the patient ultimately being diagnosed with an extraordinarily rare form of penile cancer, which would require a partial penectomy and lymphadenectomy.

The court finds that no competent evidence suggests that, had the United States transported Baker to visits with Dr. Ogle every two weeks after the February 13, 2009 visit, that Dr. Ogle would have performed the biopsy and that Baker would have been diagnosed with his penile cancer within a window of time wherein a Mohs procedure or brachytherapy would have been a viable treatment option. In fact, the court credits the persuasive evidence to the contrary. With full knowledge of the February 13 to April 24, 2009 delay in seeing Baker, with full knowledge on May 1, 2009, that Baker's condition was not improving despite several rounds of

55

medication for treatment of herpes, and with knowledge of Baker's complaints about pain and enlargement of the lesion, Dr. Ogle waited until May 15, 2009, to order a biopsy of the penile mass. Furthermore, when Dr. Ogle ordered the biopsy on May 15, 2009, he did not order that he perform the biopsy ASAP (as he had ordered for the urethral dilation procedure in December 2008). Rather, Dr. Ogle was comfortable ordering that he perform the biopsy of the penile mass in the operating room at FMC Butner, where Dr. Ogle knew that he was limited to one operating-day per month. Thus, the court finds that had the BOP transported Baker to see Dr. Ogle between February 13, 2009, and April 24, 2009, Dr. Ogle would not have ordered Baker's biopsy in that time frame and that Baker's rare form of penile cancer would not have been diagnosed in that time period.

Alternatively, the court finds that if the United States had transported Baker to visits with Dr. Ogle two weeks after the February 13, 2009 visit, as Dr. Ogle had ordered, then, based on the decisions Dr. Ogle made and the treatment he actually rendered to Baker when Dr. Ogle saw Baker on May 1, 2009, Dr. Ogle would have ordered a biopsy on the third of the two-week, post-February 13th visits, which was March 20, 2009, and that Dr. Ogle would have performed the biopsy on his third OR day at FMC Butner thereafter, which was June 15, 2009. However, June 2009 is long after the time when a Mohs procedure or brachytherapy was a viable treatment option for Baker's rare form of penile cancer. Indeed, hindsight (in the form of expert testimony at trial) shows that, in December 2008, Baker's rare form of penile cancer would have required a partial penectomy and lymphadenectomy in order for Baker to live, and Baker would have followed that treatment plan. See Def. Tr. Ex. 44 (explaining clinical practice guidelines for treating Baker's diagnosis of penile cancer).

In making this finding, the court credits the very persuasive expert medical testimony of

Dr. Hatcher and his expert report (Def. Trial Ex. 30) and the expert medical testimony of Dr. Canter and his expert report (Def. Trial Ex. 28). By no later than early December 2008, due to the rare form of penile cancer that Baker had, the location of that cancer, and the aggressive form of that cancer, the die was cast. A partial penectomy and lymphadenectomy would have been the treatment recommendation, and Mohs treatment or brachytherapy would not have been viable options. Moreover, the court finds that Baker would have followed an oncologist's recommendation for a partial penectomy and lymphadenectomy due to Baker's desire to survive an otherwise fatal form of cancer. Furthermore, the court finds that, due to his desire to live, Baker would have chosen to have the two surgical procedures (i.e., partial penectomy and lymphadenectomy) despite the direct and indirect consequences of these two surgical procedures on his penis and lymph nodes. Baker, therefore, failed to meet his burden of proving that, had the BOP transported him to see Dr. Ogle between February 13, 2009, and April 23, 2009, the outcome would have been any different.

Baker also failed to prove, by a preponderance of the evidence, that a Mohs procedure or brachytherapy would have left him in a better condition than he is today. Baker must prove that the United States' actions left him in a worse condition than he would have been in, absent its actions. The evidence does not support Baker's position. In fact, based on the persuasive evidence that Dr. Hatcher and Dr. Canter presented, the court finds that Baker would have been in at least the same, if not much worse, current condition due to the limitations of a Mohs procedure (pain, strictures, reconstruction, etc.) and the concomitant need for heightened medical scrutiny and follow up, given the increased risk of cancer recurrence with a Mohs procedure, had a Mohs procedure been a viable treatment recommendation during February through April 2009. The same conclusion applies if Baker had received brachytherapy treatment.

Baker also failed to meet his burden to demonstrate that the BOP negligently failed to transport or caused delay in scheduling Baker for the biopsy. When Baker was not on Dr. Ogle's June 5, 2009 OR schedule, the BOP submitted a request to MDI to schedule Baker to be evaluated by an MDI dermatologist for possible biopsy. Baker was on the list for dermatology clinic on June 8, 2009, but the BOP could not transport Baker due to an institution lockdown for fog. The BOP requested that MDI reschedule. The medical records document that the BOP's request of June 5, 2009, was scheduled for July 17, 2009, the date on which Dr. Ogle performed the biopsy.

Dr. Ogle performed the biopsy of the penile mass on July 17, 2009, and the pathology report revealed squamous cell carcinoma on July 21, 2009. After Dr. Mercado reviewed the pathology report, Dr. Mercado informed Baker of the diagnosis on July 27, 2009. On July 29, 2009, the MDI radiation oncologist evaluated Baker. The oncologist presented possible treatment options of penile amputation or evaluation for a Mohs procedure. Baker chose to wait to decide on his treatment until after an evaluation at Duke for a Mohs procedure. The MDI oncologist noted that the BOP would refrain from further intervention until after Baker received an evaluation and opinion at Duke concerning the viability of the Mohs procedure. The MDI oncologist also noted that he had spoken with Dr. Cook at Duke about providing Baker a Mohs evaluation and that arrangements were being made for an appointment with Dr. Cook.

Duke had to reschedule Baker's initial appointment with Dr. Cook set for August 21, 2009, to August 28, 2009, due to Dr. Cook's schedule. Unfortunately, due to an emergency at FCC Butner on that date, the BOP could not transport Baker on August 28, 2009, and the next available appointment with Dr. Cook was on September 14, 2009. On September 14, 2009, the BOP transported Baker to this appointment with Dr. Cook. Dr. Cook did not recommend a

Mohs procedure to Baker due to the form and the location of Baker's penile cancer, but he recommended an evaluation for brachytherapy with another Duke oncologist. Baker elected to wait until after the evaluation for brachytherapy before deciding upon his treatment.

Based on the persuasive expert evidence from Dr. Canter and Dr. Hatcher, the court finds that a delay from August 28, 2009, to September 14, 2009, made no difference in the outcome of Baker's condition. Furthermore, the court finds that, had Dr. Cook seen Baker on August 28, 2009, Baker would not have had an appointment any sooner than September 23, 2009, with Dr. Inman.

On September 23, 2009, the BOP transported Baker to Duke for his evaluation with Dr. Inman. Dr. Inman examined Baker and immediately recommended against brachytherapy and instead recommended an immediate partial penectomy due to the nature and location of Baker's penile cancer. On September 24, 2009, and in accordance with Dr. Inman's recommendation, Dr. Inman performed a partial penectomy. Because of the high risk posed by Baker's rare form of penile cancer and because Dr. Inman comported with the governing medical standard of care concerning the probability that the cancer had spread to Baker's lymph nodes, Dr. Inman also recommended and removed the lymph nodes in Baker's groin via a lymphadenectomy on November 19, 2009.

Baker contends that the BOP failed to provide proper medical care after Baker's lymphadenectomy, in particular, failing to order Baker to be returned to Duke when one of his JP drains malfunctioned. This claim, however, sounds in medical malpractice and has been dismissed due to Baker's failure to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure. See [D.E. 41]. Furthermore, and alternatively, upon return to FCC Butner after the penectomy and the lymphadenectomy, the BOP housed Baker in an inpatient unit within FMC

Butner with 24-hour nursing and physician care. Only a mid-level provider or a physician could order Baker to be transported to Duke for a nonscheduled appointment, such as a trip to the Duke Emergency Department. The decisions about what care to render to a patient and the care and assessment of a surgical drain, by licensed healthcare professionals, fall within the ambit of professional medical judgment. See, e.g., Littlepaige, 528 F. App'x at 294. Because this claim is based on medical malpractice and Baker failed to comply with Rule 9(j), this claim fails. See [D.E. 41].

In sum, Baker failed to meet his burden of proof. Defendant offered more persuasive evidence on the lack of proximate cause, in particular, the persuasive reports and expert testimony of Dr. Hatcher and Dr. Canter. As Dr. Hatcher and Dr. Canter persuasively explained, due to the location of Baker's rare form of penile cancer, on or next to the urethral meatus, combined with the depth of the urethral strictures from as early as December 2008, the only recommended treatment for Baker's penile cancer was partial penectomy and lymphadenectomy. Baker's rare penile cancer and its location dictated treatment with partial penectomy and lymphadenectomy. Hence, from the earliest documented observations of the symptoms of Baker's penile cancer in December 2008, the die was cast and partial penectomy and lymphadenectomy was the treatment option and the treatment that Baker would have accepted in order to live. Likewise, and alternatively, Baker failed to prove that, even if a Mohs procedure or brachytherapy had been an option, his current condition would be any better. Rather, defendant offered persuasive expert evidence from Dr. Hatcher and Dr. Canter that Baker's pain level, cosmetic appearance, risk of cancer recurrence, and long-term survival would have been, at best, no better than his current condition and, at worst, worse than his current condition. Finally, to the extent that Baker alleges that Dr. Ogle or any other medical professionals

60

committed medical malpractice, such medical malpractice is not actionable in this case due to Rule 9(j), and, in any event, was not reasonably foreseeable to the United States. Thus, the court finds in favor of the United States on Baker's negligence claim.

B.

As for Baker's negligent infliction of emotional distress ("NIED") claim, Baker must prove "that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (often referred to as "mental anguish"), and (3) the conduct did in fact cause the plaintiff severe emotional distress." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990) (citations omitted). A plaintiff also must prove that "severe emotional distress was the foreseeable and proximate result of such negligence in order to state a claim; mere temporary fright, disappointment or regret will not suffice." Id. at 304, 395 S.E.2d at 97. Severe emotional distress is "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Id. at 304, 395 S.E.2d at 97; see Waddle v. Sparks, 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992). However, a party asserting a claim of NIED need not provide expert medical testimony to establish severe emotional distress. See, e.g., Pacheo v. Rogers & Breece, Inc., 157 N.C. App. 445, 450, 579 S.E.2d 505, 508 (2003); Coffman v. Roberson, 153 N.C. App. 618, 627–28, 571 S.E.2d 255, 261 (2002).

The court has reviewed all admissible evidence and the testimony of all the witnesses, including Baker. Baker experienced anxiety about his medical condition from December 2008 until today, anxiety about his penile cancer, and anxiety about the consequences of the two

61

surgical procedures that Dr. Inman performed to treat Baker's rare form of penile cancer. Nonetheless, having considered the entire record, Baker failed to meet his burden of proof as to proximate cause or severe emotional distress. See Waddle, 331 N.C. at 83–84, 414 S.E.2d 27–28; see also Hugger v. Rutherford Inst., 63 F. App'x 683, 690 (4th Cir. 2003) (per curiam) (unpublished); Presnell v. Collins & Aiken Corp., 181 F.3d 90, 1999 WL 326079, at *5 (4th Cir. 1999) (per curiam) (unpublished table opinion); Wilson v. S. Nat'l Bank, 92 F.3d 1184, 1996 WL 445088, at *5–6 (4th Cir. 1996) (per curiam) (unpublished table opinion); Johnson v. City of Fayetteville, No. 5:12-CV-456-F, 2015 WL 928772, at *30–31 (E.D.N.C. Mar. 4, 2015) (unpublished); Maisha v. Univ. of N.C., No. 1:12-CV-371, 2015 WL 277747, at *8 (M.D.N.C. Jan. 22, 2015) (unpublished); Castonguay v. Long Term Care Mgmt. Servs., LLC, No. 1:11CV682, 2014 WL 1757308, at *13 (E.D.N.C. Apr. 30, 2014) (unpublished). Thus, the court finds in favor of the United States on Baker's NIED claim.

III.

In sum, Baker has failed to meet his burden of proof. Accordingly, judgment shall be entered in favor of the United States and against Baker. Defendant's oral motion for judgment on partial findings is DISMISSED as moot. The clerk shall close the case.

SO ORDERED. This 26 day of March 2015.

JAMES C. DEVER III
Chief United States District Judge

62